**UNITED STATES of America, Appellee,**

v.

**Wilder Mauricio MEDINA,
Defendant, Appellant.**

No. 97–2137.

United States Court of Appeals,
First Circuit.

Jan. 29, 1999.

Victoria L. Nadel, by Appointment of the Court, for appellant.

Geoffrey E. Hobart, Assistant United States Attorney, with whom Donald K. Stern, United States Attorney, was on brief for appellee.

Before SELYA, Circuit Judge,COFFIN, Senior Circuit Judge, and BOUDIN, Circuit Judge.

COFFIN, Senior Circuit Judge.

After a lengthy investigation, the government charged appellant Wilder Medina ("Medina") with six counts stemming from a conspiracy to distribute cocaine. Pursuant to a written plea agreement, Medina pled guilty to all counts but reserved the right to challenge both the amount of cocaine attributed to him and his alleged role in the conspiracy. At sentencing, the district court found that Medina was responsible for between 15 and 50 kilograms of cocaine, and enhanced his sentence two levels for occupying a managerial position in the scheme. He now appeals both findings. We affirm the court's decision regarding drug quantity, but vacate Medina's sentence because the basis for the district court's decision that Medina was a manager is not sufficiently clear for us to engage in meaningful review.

## I. *Background*

Following an investigation spanning the better part of a year, the government indicted twenty-eight individuals in an extensive drug conspiracy. The investigation began after Medina sold an eighth of an ounce of cocaine to a confidential informant ("CI") cooperating with the Drug Enforcement Administration ("DEA") on November 18, 1994.

Later that month, the CI introduced Medina to DEA Group Supervisor James Soiles ("Soiles"). Soiles promptly purchased a kilogram of cocaine from Medina, and agreed to purchase 50 kilograms more. Shortly before Medina was supposed to deliver the shipment, federal officials arrested a number of individuals close to Medina. Citing those arrests, Medina backed out of the deal, claiming that two couriers transporting the cocaine from New York to Boston had been arrested and that there was a "lot of heat."

The government expanded its investigation, and obtained authority first to intercept electronic communications made to Medina's and his brother's pagers, and later to wiretap both Medina's and Alvaro Velasquez's ("Velasquez") phones. Shortly after the wiretaps were authorized, Velasquez, a co-conspirator, was arrested in a sting operation by the United States Customs Service in Tampa, Florida, when he attempted to purchase 40 kilograms of cocaine.

Medina was subsequently observed selling cocaine to a number of individuals on a variety of occasions and was arrested along with 22 co-conspirators on October 5, 1995. Pursuant to a written plea agreement Medina pled guilty to all six counts charged against him.

The Presentence Report ("PSR") characterized the conspiracy as a "loosely formed organization with many participants who acted as retail distributors of cocaine in various amounts." Peppered throughout the PSR were extensive descriptions of Medina's drug activity, including a five page single-spaced section entitled "The Medina Branch."[1] Apparently because of the complexity of the conspiracy and drug transactions, the PSR contained no recommendation as to the proper drug quantity attributable to Medina. Instead, it restated the government's position

1. At oral argument Medina claimed that this title referred to the activities of a number of relatives who shared his last name. A brief review of the PSR belies this contention. The only other conspirators with that surname were Medina's brother Edubin Medina ("Edubin") and his cousin Johnny Medina ("Johnny"). Edubin was a minor participant in the conspiracy, and received a two level downward adjustment as a result. The only reference to Johnny in the entire PSR was that Medina and Edubin used his apartment as one of the principal stash points during the early phase of the investigation. Because Medina was the only one to receive extensive treatment in that section of the PSR, it is quite clear that "The Medina Branch" referred to Medina himself and not to other family members.

from the plea agreement that Medina should be held responsible for 15–50 kilograms of cocaine, and calculated the resulting base offense level. The PSR did, however, conclude that he was an organizer or leader of the conspiracy, and consequently recommended a four level sentence enhancement pursuant to the Sentencing Guidelines.

At the sentencing hearing, Medina objected to both the drug calculation and the role enhancement. He contended that only 5 to 15 kilograms should be attributable to him, and argued that no role enhancement was warranted due to a comparison between his activities and those of his brother Edubin who had received a two level downward adjustment for his role as a minor participant. When the court asked the government whether Medina headed the conspiracy, the government conceded that Medina was underneath Velasquez and Alejandro Mourino, "the top two men in the organization." The government then argued that "[i]f the Court didn't feel comfortable with a four level role adjustment because he's not at the very top, [it] wouldn't hear argument from [the government] that that wasn't appropriate. But [Medina] was managing other people's activities," so the government proposed a two level enhancement as a compromise.

Without elaboration, the court found Medina responsible for between 15 and 50 kilograms, and enhanced the base offense level upward two levels, consistent with the government's compromise. The resulting offense level was 33, and the court sentenced Medina to 135 months.

## II. *Discussion* [2]

### A. *Medina's Role in the Conspiracy*

■ Because it is more troubling, we start with Medina's challenge to the finding that he was a manager or supervisor.

■ The Sentencing Guidelines attempt to calibrate an individual's sentence with his relative role in a conspiracy. Section 3B1.1 of the Guidelines provides for "a range of adjustments to increase the offense level based on the size of a criminal organization ... and the degree to which the defendant was responsible for committing the offense." U.S.S.G. § 3B1.1 comment (background). To this end, the section provides that:

(a) If the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive, increase by 4 levels.

(b) If the defendant was a manager or supervisor (but not an organizer or leader) and the criminal activity involved five or more participants or was otherwise extensive, increase by 3 levels.

(c) If the defendant was an organizer, leader, manager, or supervisor in any criminal activity other than described in (a) or (b), increase by 2 levels.

U.S.S.G. § 3B1.1. The government bears the burden of proving by a preponderance of the evidence that a defendant qualifies for such an enhancement. *See United States v. Voccola*, 99 F.3d 37, 44 (1st Cir.1996).

Although the PSR concluded that Medina was an organizer or leader of an enterprise of more than five individuals, and subject to a four level increase under § 3B1.1(a), the court chose to apply just a two level enhancement under § 3B1.1(c), consistent with the government's argument that Medina managed others. The finding that Medina was a manager or supervisor is necessarily fact-specific. *See United States v. Graciani*, 61 F.3d 70, 75 (1st Cir.1995). Accordingly, the district court's determination will be afforded considerable deference, and will be set aside only for clear error. *See id.*

---

2. Before reaching the merits of Medina's appeal, we can quickly dispose of Medina's challenge to the government's supplemental appendix. On October 23, 1998, the government sought leave to file a supplemental appendix consisting solely of the affidavit of DEA Agent Peter Murphy ("the Murphy affidavit"). The government claimed that the PSR was based on the Murphy affidavit, making it relevant to the issues on appeal. The court granted the motion. Medina subsequently moved to strike the supplemental appendix and all references to it in the government's brief on the grounds that the Murphy affidavit was not before the district court. On this, Medina is simply wrong. The Murphy affidavit was the second entry on the district court's docket and was filed the same day as the initial criminal complaint. It therefore may be included in a supplemental appendix before us.

■ This court has addressed the reach of this guideline on a number of occasions. In order to apply the two level increase under § 3B1.1(c), a court must first determine that there were at least two participants in the crime. *See United States v. Mitchell*, 85 F.3d 800, 813 (1st Cir.1996). There can be no doubt that this element was met by the 28–person conspiracy at issue. The dispute centers on the other requirement, which mandates a finding that Medina "exercised control over, or was otherwise responsible for organizing the activities of, at least one other individual in committing the crime." *United States v. DiSanto*, 86 F.3d 1238, 1259 (1st Cir.1996).

■ In many circumstances, the basis for a role-in-the-offense enhancement will be apparent from the record. When this is not so, however, the sentencing court, in order to apply such an enhancement, must make a specific finding which identifies those being managed "with enough particularity to give credence to the upward adjustment." *United States v. McDowell*, 918 F.2d 1004, 1011 (1st Cir.1990). This requirement is consistent with the well-known statutory directive that the court must "state ... the reasons for its imposition of the particular sentence." 18 U.S.C. § 3553(c); *see also McDowell*, 918 F.2d at 1012. Without reasonably specific findings or some satisfactory surrogate in the record, we are unable to engage in meaningful review to determine whether the decision was clearly erroneous. *See United States v. Van*, 87 F.3d 1, 2–3 (1st Cir.1996). When a district court applies a two level enhancement under U.S.S.G. § 3B1.1(c), we cannot be left to speculate about the defendant's managerial activities.

In this case, none of the usual sources provide any guidance. The sentencing court's statements on the record were unilluminating. The court's questions attempted to compare Medina to other defendants, and counsels' replies do not address whom Medina controlled. We are left to guess whom the court believed Medina managed, and why

only a two level adjustment was justified.[3] An examination of the PSR offers equally little assistance. The PSR concluded that Medina occupied a leadership role in the conspiracy, but it contains no explicit analysis of Medina's managerial or supervisory activities. It is possible that the probation officer believed, albeit erroneously, that detailing all the sales Medina made to others justified the adjustment. *See, e.g., United States v. Graham*, 162 F.3d 1180 (D.C.Cir.1998) (noting enhancement not warranted merely on characterizing defendant as lieutenant or middleman in cocaine distribution conspiracy); *United States v. Sostre*, 967 F.2d 728, 733 (1st Cir.1992) (a finding that defendant played an "essential role" in drug conspiracy insufficient to warrant enhancement under § 3B1.1).

Although the sentencing transcript and the PSR provide inadequate direction, we could affirm if the reasons for the judge's choice are obvious or if the record as a whole provides an explanation. *See United States v. Quinones*, 26 F.3d 213, 219 (1st Cir.1994). In this case, however, the voluminous record adds little clarity. The Murphy affidavit details the minutiae of the government's surveillance and Medina's drug transactions, but neither it nor anything else in the record furnishes an obvious basis for the court's decision that Medina exercised control over others in the conspiracy.

In fact, the murkiness of the record is evident by the government's own arguments. In its brief, the government suggested that Medina managed his cousin Johnny. At oral argument, the government argued that, should the case be remanded, it would produce evidence that Medina managed Edubin. This contradiction itself highlights the confusion surrounding this issue, and suggests that the government might be reaching to justify an enhancement which, while perhaps supportable, was not inevitable based on this record.

■ The decision that another participant in the crime was managed or supervised by Medina is a determination, in the first instance, to be made by the district court. We

---

**3.** Under U.S.S.G. § 3B1.1(b), the court may adjust upward three levels if Medina was a manager or supervisor and the criminal activity involved five or more participants. Since the conspiracy involved twenty-eight participants, it seems evident that, if Medina was a manager or supervisor, a three level adjustment might have been supportable as well.

refuse to engage in the speculation that would be required to determine what Medina was doing to manage someone else, and who that someone was.[4] Consequently, we will remand for resentencing and allow the district court to redetermine whether Medina's sentence should be enhanced due to his role in the offense, and, if so, why.

## B. *Drug Volume Attributed to Medina*

Medina also challenges the sentencing court's finding that he was responsible for between 15 and 50 kilograms of cocaine.

Noting again that the district court did not make explicit findings, Medina argues that, in order to reach the 15 kilogram minimum threshold, the court must have attributed to him either the undelivered 50 kilograms or the 40 kilogram transaction for which Velasquez was arrested in Tampa. He claims that neither transaction should be included. With respect to the unconsummated 50 kilogram transaction, he contends that he lacked the intent and capacity to deliver that amount. If that were true, under the guidelines and our caselaw that amount could not be used to calculate his sentence. *See* U.S.S.G. § 2D1.1, Application Note 12; *United States v. Wihbey,* 75 F.3d 761, 777 (1st Cir.1996). In his challenge to the 40 kilograms in Tampa, Medina maintains that the government had minimal evidence connecting him to that shipment, and has not shown by a preponderance of the evidence that he was involved.

The government, in response, claims that Medina's challenge misses the mark. The government concedes that it was not relying on the 50 kilogram transaction in calculating drug quantity, but it suggests that it tied Medina to the Tampa sting by a preponderance of the evidence.[5] It goes on to insist that, even if the 40 kilograms are

excluded, the unchallenged portions of the PSR firmly support the district court's finding that the 15 kilogram minimum threshold has been surpassed. Adding all the transactions in those paragraphs of the PSR, it correctly asserts that they total 15.956 kilograms.

Consequently, the dispute about the 40 kilogram sting is irrelevant. The unchallenged portions of the PSR provide us with an independent ground on which to justify our decision. *See United States v. Rosales,* 19 F.3d 763, 770 (1st Cir.1994) (noting that a court may accept, as true and accurate, any unchallenged facts contained in the PSR). Although we vacate Medina's sentence due to insufficient findings regarding his managerial role, we affirm the court's finding that Medina was responsible for between 15 and 50 kilograms of cocaine.

Accordingly, *Medina's sentence is vacated and the action is remanded for resentencing.*

---

4. The government claims that Medina was a manager because he set the prices for the cocaine he sold to other distributors. The mere fact that Medina set the prices of sales to other distributors, as opposed to the prices those distributors charged to customers, does not justify the conclusion that he managed or supervised them. *See United States v. Vargas,* 16 F.3d 155, 160 (7th Cir.1994) ("[S]upplying drugs and negotiating the terms of their sale do not by themselves justify a Section 3B1.1 increase.")

5. In support of inclusion of the 40 kilo Tampa transaction, the court stated its "understanding from the representations of the government that [Medina] was involved in a 40–kilo transaction, which in itself is over the 15 [kilogram minimum] level." Shortly thereafter, the court found "the weight of narcotics attributable to [Medina to be] between 15 and 50 kilograms." However, the court could not have attributed the entire amount to him, because otherwise Medina's drug quantity would be 55.956 kilograms (*i.e.* 40 kilograms plus the 15.956 kilograms from the unchallenged portions of the PSR).