# United States Court of Appeals
## For the First Circuit

No. 99-1232

UNITED STATES OF AMERICA,

Appellee,

v.

EDWARD R. HUGHES,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND

[Hon. Ernest C. Torres, U.S. District Judge]

Before

Torruella, Chief Judge,
Selya, and Lipez, Circuit Judges.

Joseph R. Palumbo, Jr. for appellant.
Donald C. Lockhart, Assistant United States Attorney, with whom Margaret E. Curran, United States Attorney, and Edwin J. Gale, Assistant United States Attorney, were on brief for appellee.

May 8, 2000

**LIPEZ, <u>Circuit Judge</u>**.  The defendant, Edward Hughes, was convicted by a jury on one count of attempted extortion. According to the government, Hughes attempted to extort money from his employer by murdering the company president, Brian McCarthy, in Mexico, reporting it as a kidnapping and issuing a phony ransom demand.  On appeal, Hughes contends that: (1) the evidence was insufficient to support the conviction; (2) the government improperly made statements to the jury during closing argument that were unsupported by the evidence in the record; (3) the government's failure to produce all of the crime scene photographs violated his right to a fair trial; (4) his sentence was incorrectly calculated using the guideline for first degree murder; and (5) the district court erred in ordering him to pay restitution.  Unpersuaded by these arguments, we affirm both the conviction and the sentence.

## I.  THE PLOT

We begin by summarizing the twisted plot, adding more detail below as it becomes relevant to the legal analysis.  We recite the facts in the light most favorable to the jury's verdict, to the extent consistent with record support.  <u>See</u> <u>United States</u> v. <u>Escobar-de Jesus</u>, 187 F.3d 148, 157 (1st Cir. 1999).  By the early 1980s, Hughes had earned a reputation as one of the top computer software engineers in America.  After

-2-

designing complex computer systems for the United States Department of Defense, Hughes and his close friend, Dennis Toomey, started their own computer software company, Ocean Systems. The two added a third partner, Donald Hastings, and in 1982 the three men sold the company to Analysis & Technology ("A & T"), staying on as A & T employees. In 1986, A & T entered into a joint business venture with Browne & Sharpe to create Automation Software, Inc. ("ASI"). Thereafter, Hughes, Toomey, and Hastings became ASI employees, with Hastings serving as president and Hughes as vice president. Hastings died the following year, and the ASI board commenced a search for a new president. The top candidates were Hughes and Brian McCarthy, a new ASI employee in sales and marketing hired by Hastings shortly before his death. Although McCarthy was an ASI neophyte, significantly younger than Hughes, and lacked Hughes's technical expertise, the board chose McCarthy to succeed Hastings. Hughes was upset. As the sitting vice president, he believed that he should have been offered the job, and he questioned McCarthy's qualifications for the position. Moreover, McCarthy's vision for ASI clashed with Hughes's. McCarthy wanted to expand ASI into a large company; Hughes wanted ASI to remain small, employing only elite software designers who would produce high-end programs.

In 1992, Hughes resigned as vice president, contracting to work half time in exchange for two-thirds of his original salary. Thereafter, Hughes spent most of his time in Mexico, installing and servicing computer software for ASI's Mexican customers. Although Hughes maintained his residence in Rhode Island, he purchased a home in Mexico and planned to relocate there. Meanwhile, Hughes persistently complained about the quality of ASI's software under McCarthy's leadership, occasionally even criticizing ASI's software in front of clients. Aware of this conduct, McCarthy arranged at a meeting of ASI's board of directors to terminate Hughes's relationship with the company by buying out the remainder of his contract. In mid-January 1994, McCarthy decided to travel to Mexico to meet with Martin Marquez, an ASI sales representative, and to visit the Cummins diesel engine plant, an ASI customer located in San Luis Potosi. While there, McCarthy also planned to tell Hughes about the board's decision to terminate his employment relationship with ASI.

On January 30, Hughes traveled by bus from Florida, where he had been vacationing with his wife, to Laredo, Texas. Hughes later told FBI Special Agent Nicholas Murphy that he was in no hurry because he did not expect to install the new ASI equipment at the Chrysler plant in Toluca, Mexico, until

-4-

February 3 or 4. Arriving in Laredo on February 1, Hughes rented a Ford Tempo from the Budget rental agency in Laredo and drove to Mexico City. Upon reaching Mexico City, Hughes notified Marquez that he planned to pick up McCarthy at the Mexico City airport on Sunday night and that the two of them would drive to San Luis Potosi, four hours northwest of Mexico City. Marquez advised Hughes not to drive, and even volunteered to drive himself, but Hughes insisted, saying that he needed to talk to McCarthy in private.

On Sunday, February 6, McCarthy celebrated his daughter's tenth birthday in Michigan. He then boarded an airplane to Mexico City, meeting Hughes at the airport at approximately 10:30 p.m. The two men left the airport in Hughes's rental car and drove northwest toward Queretaro, a city about half way between Mexico City and San Luis Potosi. McCarthy was never again seen alive. The next day, February 7, at approximately 10:00 p.m., the Mexican authorities found his partially buried body in rubble alongside the Queretaro bypass highway. He had been shot five times.

On February 7 at 5:15 p.m., Hughes boarded a flight from Mexico City to New York, arriving in New York at 11:00 p.m. The next morning, while still in New York, Hughes placed a telephone call to Joanne Keaney, ASI's controller. He told her

that during the drive from the Mexico City airport to San Luis Potosi, when he and McCarthy had pulled over to the side of the road because McCarthy had to relieve himself, they were attacked by three men. He said that the assailants threw him into the back seat of the rental car, ordered him to keep his head down, and drove the car around for a while before stopping at a house. In the house, Hughes said he heard his abductors refer to McCarthy in the present tense, thereby implying that McCarthy was still alive. The kidnappers then brought Hughes to the airport, provided him with his credit card and passport, and warned him that they would kill McCarthy if he did not return with one million pesos (about $325,000) within forty-eight hours.

Later that morning, when he arrived back at ASI's Rhode Island office, Hughes met with several members of ASI's management team. He recounted the story of the kidnapping and ransom demand. ASI owned executive kidnapping insurance, and the insurer promptly hired the Ackerman Group, a Miami-based company that specializes in handling executive kidnappings. Collaborating with Emanuel Ackerman, the group devised a plan to wire the ransom money to Hughes and an ASI vice president, Stephen Logee, in Mexico. Hughes would then meet with the kidnappers to make the payment. Hughes objected to the plan.

He proposed instead that the money be given to him directly and that he fly alone to Mexico to execute the exchange. Hughes refused to say exactly where the ransom exchange would be, stating only that he was to contact the kidnappers in a public place. The group decided to follow the Ackerman plan, in part because customs procedures would prevent carrying large sums of cash across the border.

Hughes then borrowed a car, explaining that he wanted to go home to take a shower. A little while later, Hughes called the office to say that he had decided not to return to Mexico. After some coaxing, however, Hughes agreed to travel to Miami with Logee to meet with Ackerman. Meanwhile, the Mexican police, who had recovered McCarthy's body the night before, traced a bloody parking ticket found in his shirt pocket to his company car parked in the Detroit airport. When Hughes arrived at Rhode Island's T.F. Green airport later that afternoon for his trip to Miami, Logee informed him that the Mexican police had recovered a body believed to be McCarthy's. Hughes, appearing to get sick, immediately left the airport and refused to travel to Miami. The next day Hughes called Keaney to say that he was resigning from ASI.

In September 1996, a federal grand jury indicted Hughes for attempting to extort money from ASI in violation of the

Hobbs Act, 18 U.S.C. § 1951.[1]  Following a ten day trial, Hughes

was convicted by a jury, sentenced to twenty years' imprisonment

and three years' supervised release, and ordered to pay

restitution.  Hughes now appeals from his conviction and

sentence.

## II. THE SUFFICIENCY OF THE EVIDENCE

We must evaluate whether the evidence, viewed in the

light most favorable to the government, was sufficient to

support the jury's verdict--i.e., whether a rational trier of

fact could have found the essential elements of the crime beyond

a reasonable doubt.  See United States v. Czubinski, 106 F.3d

1069, 1073 (1st Cir. 1997).  When reviewing for the sufficiency

of the evidence, "all reasonable inferences must be drawn in the

light most favorable to the government."  United States v. Bay

State Ambulance & Hosp. Rental Serv., Inc., 874 F.2d 20, 36 (1st

Cir. 1989) (citation omitted).  The government need not produce

direct evidence to meet its burden of proof: "circumstantial

evidence, if it meets all the other criteria of admissibility,

---

[1]Hughes was prosecuted for homicide in Mexico.  He was initially acquitted, but, as permitted under Mexican law, the acquittal was appealed by the public prosecutor.  The Mexican appellate court reversed, convicting Hughes of murder and sentencing him to 19 years imprisonment.  Prior to the appellate court's conviction, Hughes had been released on bail, and at the time of his trial in the United States, Hughes was a fugitive from the Mexican judicial system.

is just as appropriate as direct evidence and is entitled to be given whatever weight the jury deems it should be given under the circumstances within which it unfolds." United States v. Gamache, 156 F.3d 1, 8 (1st Cir. 1998). Moreover, the government "need not present evidence that precludes every reasonable hypothesis inconsistent with guilt"; the jury is generally "at liberty to select freely among a variety of reasonable alternative constructions of the evidence." United States v. Reeder, 170 F.3d 93, 102 (1st Cir. 1999).

To affirm Hughes's conviction under the Hobbs Act, 18 U.S.C. § 1951,[2] we must find that the evidence was sufficient to permit a jury to conclude beyond a reasonable doubt that Hughes attempted to extort money from ASI.[3] Our sufficiency inquiry

---

[2]The Hobbs Act, 18 U.S.C. § 1951(a), provides in relevant part:

> Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section shall be fined under this title or imprisoned not more than twenty years, or both.

[3]For a conviction under the Hobbs Act, the government must also prove that the extortion "obstructs, delays, or affects" interstate commerce. See 18 U.S.C. § 1951(a). ASI does business in several states and Mexico, and Hughes does not contest that an attempt to extort money from ASI would have an

-9-

must, therefore, focus on whether Hughes killed McCarthy. If he did, the kidnapping story was bogus and his ransom request was an attempt to extort money from ASI. Conversely, if Hughes was an innocent messenger merely conveying the kidnappers' ransom demand, he is obviously not guilty of extortion.

We conclude that there was sufficient circumstantial evidence to establish that Hughes killed McCarthy and contrived a fallacious kidnapping and ransom story. First, Hughes was the last person seen alive with McCarthy. McCarthy's body was found on a bypass highway where Hughes and McCarthy were likely to have been traveling together on their drive from Mexico City to San Luis Potosi. The autopsy established that the time of death was between 2:00 a.m. and 8:00 a.m. on February 7. Thus, McCarthy was already dead by the evening of February 7, the time that Hughes says the bandits made the ransom demand and took him to the Mexico City airport.

Second, Hughes had a motive to kill McCarthy. There is no doubt that the relationship between the two men had been strained from the time that ASI's board selected McCarthy over Hughes to serve as company president. Hughes objected to McCarthy's leadership and vision for the company, and frequently

---

effect on interstate commerce sufficient to trigger the Hobbs Act.

complained about McCarthy. Hughes confessed to his friend Toomey that he feared he would be fired and that ASI would "abrogate" his employment contract. Hughes's fears were well founded. Prior to traveling to Mexico, McCarthy arranged with ASI's board to terminate Hughes, and he planned to convey the news to Hughes during the trip to Mexico. Of course, the money Hughes stood to recover as ransom provides an independent financial motive for the murder.

Third, Hughes behaved unusually in the days preceding the murder in several ways. Although Hughes did not like to drive in Mexico, and virtually never did, he rebuffed Marquez's offer to drive and decided to rent a car. Moreover, although he could have rented the car in Mexico City, he went to Laredo, Texas, twelve hours from his destination. What is normally a twelve hour drive from Laredo to Mexico City took Hughes forty-six hours to complete. Hughes told McCarthy's secretary to book McCarthy on a late flight into Mexico because Hughes said he would be busy all day. As it turns out, Hughes was not busy at all. Finally, although Marquez warned him that the roads were bad and advised him not to drive at night, Hughes decided to pick up McCarthy at the airport at 10:00 p.m. and to drive four hours to San Luis Potosi, explaining to Marquez that he needed to talk to McCarthy in private.

Fourth, Hughes arrived in the Mexico City airport for a flight home in the late afternoon of February 7, but he did not notify anyone about the kidnapping or ransom demand until the morning of February 8--almost 15 hours later. He offered only the lame excuse that he did not have his calling card with him.

Fifth, McCarthy's five-thousand-dollar laptop computer and a car worth over ten thousand dollars were found abandoned. Why would bandits, who were allegedly seeking ransom money, abandon these valuable items? No good explanation was offered.

Sixth, the story told by Hughes to Special Agent Murphy was full of holes. Hughes told Murphy that when he arrived in Laredo on February 1, he considered traveling to Mexico City by bus. However, Marquez testified that in January 1994, almost a month earlier, Hughes told him that when McCarthy came to Mexico he planned to rent a car in Laredo. Hughes also told Murphy that when he arrived in San Luis Potosi, on his way to Mexico City, he tried unsuccessfully to reach Marquez. Yet, Marquez testified that he or some family member was home all day. Hughes said that he slept in his car that night because he could not find a hotel, even though San Luis Potosi is a large city with many hotels and Hughes had stayed in hotels there on prior occasions. Hughes said he awoke at 2:00 a.m. and continued his

drive to Mexico City, arriving at approximately 2:00 p.m.  This means that it took Hughes almost twelve hours to complete the four hour drive from San Luis Potosi to  Mexico City.  Hughes also stated that the bandits held McCarthy because McCarthy was dressed in business attire.  Yet, the evidence suggests that McCarthy was wearing jeans and boat shoes when he left Detroit for Mexico.  Hughes claimed that he was forced to stop several times during the drive because McCarthy complained of some kind of intestinal infection and needed to relieve himself.  The autopsy report, however, showed no sign of intestinal distress, and McCarthy's wife testified that her husband had not been ill when he left home several hours earlier.

Seventh, when Hughes met with ASI officers, he was adamant that he be given the money directly and that he be allowed to return alone to Mexico to execute the ransom exchange.  He refused to divulge the precise location where the ransom exchange would take place.  Yet, after the ASI officers decided to wire the money to Mexico, and to send Logee to Mexico to accompany him, Hughes refused to participate in the rescue plan.

Finally, and decisively, the FBI recovered cartridge casings on Hughes's property in Rhode Island, and the ballistics expert testified that these casings were expelled from the same

gun that produced the spent cartridge casings recovered at the scene of the crime in Queretaro.  Moreover, the expert stated that only one gun in the world could have produced the signature markings shared by these casings, explaining that a gun leaves unique marks on a spent shell casing somewhat akin to a fingerprint.  The expert further testified that all the casings were 9 mm, and that the bullet fragments recovered from McCarthy's body could have been 9 mm.  In addition, a salesman at a Rhode Island gun store testified that in September 1993, Hughes purchased a Sig Sauer 9 mm pistol, and a friend of Hughes's son testified that he had participated in some target shooting on Hughes's Rhode Island property a short time before the murder took place using a gun that resembled the Sig Sauer. The evidence, therefore, indicates that the same 9 mm pistol used on Hughes's Rhode Island property was used to kill McCarthy, or, more precisely, that Hughes's 9 mm Sig Sauer pistol purchased in September 1993 was the murder weapon.[4]

---

[4]Hughes also contends that the evidence was insufficient to establish his intent to extort money from ASI because "[a]ssuming arguendo that the defendant for some reason did not truthfully reveal the events of the night of February 6, the evidence points at least equally to an intent solely to cover up the events as it does to any intent to actually obtain money from ASI as 'revenge.'"  Hughes confuses motive with intent. Even if, as Hughes contends, his primary motive was to cover up the murder, he nevertheless intended to carry out the cover up scheme by issuing an extortionate demand to ASI.

For all of these reasons, we find that the evidence was sufficient to permit a rational jury to conclude beyond a reasonable doubt that Hughes murdered McCarthy. Accordingly, Hughes did not innocently transmit to ASI a ransom demand for one million pesos. Instead, he used the threat of harm to McCarthy to extort money from ASI.[5]

### III. THE GOVERNMENT'S CLOSING ARGUMENT

Hughes assails the government for making numerous statements--nine in all--within its closing argument that were unsupported by the evidence in the record.[6] He demands a new

---

[5]Hughes also contends that the district court omitted an essential element of the crime by failing to instruct the jury that it had to find beyond a reasonable doubt that ASI was the victim of the attempted extortion. This contention is frivolous. The court instructed the jury in plain terms that the charge against Hughes was that he "attempted to obtain money from <u>Automation Software, Inc.</u> by the wrongful use of fear or threats of violence or violence." (Emphasis added.)

[6]Hughes also identifies an additional twenty-seven errors of this kind in an addendum to his brief. With respect to those errors asserted only in the addendum, Hughes has waived his argument. It is a "settled appellate rule that issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived." <u>United States</u> v. <u>Zannino</u>, 895 F.2d 1, 17 (1st Cir. 1990). Whatever level of development is required to satisfy this standard, it is not met by merely cataloguing bare portions of the record in an addendum. Although Local Rule 28(a)(4) provides that the appellant must include in an addendum, "Other items or short excerpts from the record, if any, considered necessary for understanding the specific issues on appeal," inclusion in the addendum is no substitute for developed argumentation in the body of the brief. Indeed, allowing a party to use an addendum to raise a laundry list of additional issues not individually

-15-

trial because of these abuses.  Given defense counsel's failure to object to these statements at trial, we review the prosecutor's remarks only for plain error.  See United States v. Bey, 188 F.3d 1, 6 (1st Cir. 1999).  We will not reverse a conviction for plain error unless it is clear that, inter alia, the error "affected the outcome of the proceedings." Id. (citing United States v. Olano, 507 U.S. 725, 734 (1993)).  We discern only one minor error--and no  plain error--in the prosecutor's closing argument.

## A.  The Ballistics Expert's Testimony

Hughes  objects to the prosecution's statement to the jury that the ballistics expert's testimony, "tells us, circumstantially, that the murder weapon was the Defendant's 9 mm Sig Sauer, the one he bought on September 30th of 1993 from D & L Shooting Supplies."  Hughes contends: (1) that the ballistics expert did not identify the type of gun used in the murder; (2) that the bullets were as likely to have come from a .38 caliber as a 9 millimeter; (3) that there was no evidence

---

addressed and argued in the brief would all but eviscerate Fed. R. App. P. 32(a)(7), which prescribes detailed page limitations to which both parties must adhere.  We do not suggest that waiver applies unless every objected-to portion of the record is quoted in full in the brief.  Rather we reiterate that, irrespective of any material reproduced in an addendum, we will only credit arguments actually developed within the body of the brief.

that Hughes had a gun in Mexico; (4) that the presence of the cartridge casings at the murder scene was not tied to the bullets recovered from the body; and (5) that there was no proof that the bullets from the spent cartridge casings were fired where the cartridge casings were found or that they were fired from Hughes's 9 mm Sig Sauer pistol.

Hughes's objections disregard the nature of circumstantial evidence and reasonable inferences drawn therefrom. The ballistics expert testified that only one gun in the world could have produced the markings found on both the cartridge casings recovered at the scene of the crime and those found on Hughes's property in Rhode Island. As detailed above, this evidence permits the inference that the same 9 mm pistol that was used on Hughes's Rhode Island property was also used as the murder weapon, and that this gun was the Sig Sauer 9 mm pistol that Hughes purchased in September 1993. Moreover, as detailed below, the evidence suggests that the likely reason that Hughes drove from Laredo, Texas, to Mexico City just prior to McCarthy's arrival was to smuggle his pistol into Mexico.

**B.  The Trip Across the Mexican Border**

Hughes objects to the prosecutor's statement to the jury that:

> the defendant tells [FBI Special Agent] Murphy that he gets the car from Budget. He

must have told them that he wasn't going south of Monterey. Why did he have to have a car? He needed a car to get his gun across the border. That's what it boils down to, Ladies and Gentlemen. No magnetometers, no x-rays, lots of places to hide a gun.

There is ample evidence in the record to support this statement. Hughes told agent Murphy that he rented a car from the Budget agency in Laredo, Texas. Because the manager at that agency testified that it was company policy not to allow cars to be driven south of Monterey, and the agency rented a car to Hughes, it is reasonable to infer that Hughes said he was not going south of Monterey.

The evidence also supports an inference that Hughes rented a car and drove across the border as a means of smuggling a gun into Mexico. First, on the numerous prior occasions that Hughes visited Mexico on business, he had virtually never rented a car. Marquez testified that Hughes disliked driving in Mexico and typically requested that Marquez drive. Second, there is simply no good alternative explanation for Hughes's decision to rent a car in Laredo, Texas, a twelve hour drive from his final destination of Mexico City. There were rental cars available in Mexico City, including cars from American rental car agencies. Third, because the evidence suggested that Hughes's 9 mm Sig Sauer pistol ejected the cartridge casings found at the crime scene in Queretaro, Hughes must have transported a gun into

Mexico somehow.  The most plausible explanation is that he carried it with him during his drive from Laredo.  It is common knowledge that airports have magnetometers and x-ray machines designed to detect concealed weapons.

## C.  McCarthy's Late-Night Arrival in Mexico

Hughes objects to the prosecutor's statement that Hughes "said [to Sawicke] he was busy that weekend, and he couldn't pick up [Brian McCarthy] until at least ten o'clock. . . . This is the reason.  He wants it dark.  Darkness is the ancient ally of criminals."  Hughes insists that the prosecutor's attempt to show that he was not actually busy on that date was misleading because the "undisputed evidence" indicated that he would have been busy but for the failure of certain equipment to be delivered to the Chrysler plant in Toluca.  Moreover, the attribution, "he wants it dark," was particularly misleading because it was McCarthy who selected the evening flight time.  We find no error.

Sandy Sawicke, McCarthy's secretary, testified that in a telephone conversation with Hughes, he said that he had a very busy schedule that weekend and McCarthy should not arrive before 10:00 Sunday night.  Although McCarthy had previously suggested that he take an evening flight, the 10:00 p.m. arrival time was scheduled at the behest of Hughes, not McCarthy.

-19-

Furthermore, the evidence established that Hughes was not particularly busy that Sunday, as he had claimed he would be. Although there was some indication that Hughes's work plans may have been disrupted by a delayed shipment of ASI equipment to the Chrysler plant, the jury was entitled to infer that Hughes's busy schedule was a pretext to justify McCarthy's late arrival. From the evidence that Hughes wanted McCarthy to arrive late, and that Hughes's Sig Sauer was the likely murder weapon, a reasonable juror could also have inferred that Hughes wanted it dark during the drive to San Luis Potosi so that he could kill McCarthy undetected.

## D. The Queretaro Bypass Highway

The defendant objects to the prosecutor's following statements:

> Let's briefly talk about the murder. You know that the Defendant picked up Brian McCarthy between ten and eleven in Mexico City. The Defendant uses the directions provided to him by Martin Marquez to get on the road to Queretaro. Two days earlier, of course, he's had lots and lots of time to go through in daylight and at night to check out any sites he might want to use for killing Brian McCarthy. And it's late at night, and the evidence is that the Defendant took the Queretaro bypass.
>
> . . . .
>
> He had a lot of time, a lot of time to scope out a location where he would kill McCarthy on the way to San Luis Potosi. Against the

-20-

> advice of Martin Marquez, he chose to drive
> that lonely dark road in the middle of the
> night, when there was just no reason to.

Hughes insists that this is a "prejudicial misstatement of fact" because there is no evidence that Hughes and McCarthy took the bypass road around Queretaro, or that Hughes spent time during the previous two days checking out a site to murder McCarthy. We disagree.

Marquez testified that Hughes told him he planned to pick up McCarthy at the Mexico City airport and drive to San Luis Potosi. The city of Queretaro is on the way from Mexico City to San Luis Potosi, about half way between those two cities, and it would have been logical for Hughes to take the bypass highway. There was also ample evidence from which the jury could infer that Hughes spent time during his trip from Laredo to Mexico City checking out potential murder sites. Special Agent Murphy testified that Hughes told him that he crossed the border into Mexico at about 4:00 p.m. on February 1, and did not arrive in Mexico City until 2:00 p.m. on February 3, forty-six hours later. The drive from Laredo to Mexico City normally takes about twelve hours and the route runs past Queretaro. Thus, Hughes had plenty of unaccounted-for time in the area of the murder. Finally, because Marquez testified that he told Hughes that the roads between Queretaro and San Luis

Potosi were under construction and dangerous, and he advised

Hughes against driving at night, the prosecutor's statement to

that effect was accurate.

**E. The Murder Site**

Hughes objects to these statements of the prosecutor:

Let me ask you, Ladies and Gentlemen, an
ideal place to kill Brian McCarthy, but why
would bandits select that site?  The
evidence suggests they wouldn't, and this is
why.  You will recall that Hughes tells us
that once they're attacked, they're put in
the car and driven around for some length of
time.  This is a toll road, and to get off
this road, you have to go through another
toll.  What bandits.  What bandit is going
to drive through a toll booth, where there's
evidence there are police with Mr. Hughes in
the back seat as a hostage?

. . . .

No Robber is going to work off that toll
road.  Why? . . . [T]here's a toll booth
just before you get on it. . . . [L]ikewise,
. . . there's a toll booth just before you
get off.

Hughes argues that "[t]here is no evidence, expert,

circumstantial, or otherwise, that McCarthy was killed at the

place that he was found.  There is no evidence that the accused

was <u>ever</u> on that toll road.  There is no evidence that anyone

had to drive through '<u>another toll</u>.'" (Emphasis in original.)

Absent any evidence that the body was moved or

transported, it was appropriate for a jury to infer that

-22-

McCarthy was killed where he was found, particularly when the shell casings were found near the body and a trail of blood led from the roadside to a shallow grave in which the body was buried. As discussed above, there was circumstantial evidence that Hughes and McCarthy drove on the bypass highway. There was also evidence that the bypass was a toll road with at least one tollbooth, and that it is common practice in Mexico for police or military officers to be stationed at tollbooths. Hence, there was some basis in the evidence for the government's explanation of why kidnappers would be unlikely to abduct someone on the bypass highway.

To the extent, however, that the government's statement emphasized the existence of a second toll booth through which the bandits would have had to pass after the abduction, there was an insufficient evidentiary basis for that assertion. Indeed, FBI Special Agent Gilbert Contreras testified that he did not think that there was a second toll booth in place at the time of the killing. We readily conclude, nonetheless, that this misstatement, in the context of the substantial circumstantial evidence supporting the jury's verdict, did not prejudice Hughes, and therefore, did not constitute plain error. See United States v. Rodriquez-Cardona, 924 F.2d 1148, 1153-54 (1st Cir. 1991) (no plain error where improper remarks in

government's closing statement did not effect the outcome of the trial given the strength of the government's case against the defendant).

**F.  The Leatherman Tool**

Hughes complains that "twice, the prosecutor misstated the evidence about the Leatherman tool to inflame the jury." During closing argument, the prosecution suggested that Hughes's description of the kidnappers patting him down did not square with the fact that he arrived back in the United States carrying the Leatherman tool--a device with several sharp knives--in his canvas bag.  Moreover, the government argued that because Hughes realized this inconsistency in his story, he eagerly sought to retrieve the bag from the FBI.  Again, we find the government's reasoning valid.

The Leatherman tool was considered dangerous enough that it was confiscated by a flight attendant during Hughes's return trip to the United States from Mexico;  Hughes told agent Murphy that the bandits had patted him down; and Hughes did appear especially eager to retrieve the canvas bag, telephoning Loraine Bertolini, in whose car he had left it, to ask her to get the bag back from the FBI because it had "sentimental value" to his wife.

**G.  The Tire Tracks**

According to Hughes, it was a "raw abuse" of power for the government to tell the jury that "the tire tracks are not part of the case." Once again, Hughes's complaint misses the mark. Although a crime scene investigator for the Mexican government testified that he had noted tire tracks by the roadside, the significance of this evidence was fairly debatable. Hughes presented a witness who testified that the factory tires on the Ford Tempo he rented were slightly wider than the tracks measured at the crime scene. Hughes argued that the rental car probably had factory tires because it was new, and the discrepancy in the measurements proved that Hughes's rental car did not make the tracks found at the crime scene. Upon cross-examination, however, Hughes's witness admitted that he had never measured the imprint that such a tire would make in sand, the surface at the crime scene, and that he did not know what make of tire was actually on the car that Hughes drove. Accordingly, the government was entitled to argue that the tire track evidence was insignificant, although, as always, the jury was free to adopt a different interpretation of the evidence.

## IV. THE MISSING CRIME SCENE PHOTOGRAPHS

Roberto Gonzalez Moreno, a Mexican police officer, took thirty-seven photographs of the crime scene, some of which were apparently used during Hughes's murder trial in Mexico. Only

nine of these photographs, however, made their way to the United States Attorney's Office for use in the trial.  One of these nine photographs depicted one of the two cartridge casings recovered from the crime scene.  Hughes insists that this photograph was exculpatory because the cartridge casing depicted in the photograph differed in color from the actual cartridge casing that the government introduced in evidence.  Among the missing photographs was one that depicted the second cartridge casing recovered at the crime scene.  Extrapolating from the putatively exculpatory value of the picture of the first cartridge casing, Hughes contends that this missing photograph would likely have proven exculpatory as well.  Thus, Hughes argued to the court at trial that the government's failure to produce the photograph of the second cartridge casing required the court to exclude both of the actual cartridge casings from evidence.[7]

The district court rejected this argument, concluding that the government was under no obligation to produce the missing photographs because they were not within the

[7]In addition to his objections based on the missing photographs, Hughes vigorously contested at trial the authenticity of the shell casings and the bullet fragments.  The court focused considerable attention on this issue before ruling that the casings and the fragments had been properly authenticated and were admissible as evidence.  Hughes does not challenge these evidentiary rulings on appeal.

government's control.  Moreover, despite Hughes's insistence that the photograph of the first cartridge casing was exculpatory, the court found "the color of the casing in that photograph . . . to be the same as the casing the government intends to offer," and concluded, "I fail to see anything exculpatory about it."

In affirming the district court's ruling, we need not inquire into the potential exculpatory value of the missing photographs.  Because the government was never in control of the photographs, it is not responsible for any failure to produce them.  See United States v. Friedman, 593 F.2d 109, 119-20 (9th Cir. 1979) (evidence that was in Chile was not within the control of the government for the purposes of Brady or Rule 16); United States v. Flores, 540 F.2d 432, 437-38 (9th Cir. 1976). It is axiomatic that the government must provide the criminal defendant with access to material exculpatory evidence within its control, see Brady v. Maryland, 373 U.S. 83, 87 (1963); see also Fed. R. Crim. P. 16(a)(1)(C),[8] and the government may not in bad faith fail to preserve potentially exculpatory evidence,

---

[8]Federal Rule of Criminal Procedure 16(a)(1)(C) provides in relevant part: "Upon request of the defendant the government shall permit the defendant to inspect . . . photographs . . . which are within the possession, custody or control of the government, and which are material to the preparation of the defendant's defense . . . ."

-27-

see Arizona v. Youngblood, 488 U.S. 51, 58 (1988).  However, the government has no duty to produce evidence outside of its control, see United States v. Sepulveda, 15 F.3d 1161, 1179 (1st Cir. 1993), and it is not responsible for the preservation of evidence that was never in its control in the first place, see United States v. Lewis, 40 F.3d 1325, 1340 (1st Cir. 1994); United States v. Femia, 9 F.3d 990, 993 (1st Cir. 1993).

Although the government obviously did not have physical possession or custody of the missing photographs, Hughes contends that its inadequate efforts to secure the missing photographs from Mexico belied its ability to control them. This argument is unavailing.  As the district court aptly explained, "Mexico is a sovereign nation, and it's clear that the United States Government has no authority to require the Mexican Government to produce any evidence that may be in its possession or under its control.  It has to rely on the Mexican government to comply with reasonable and appropriate requests."

The government's persistent, but fruitless, efforts to obtain the missing photographs demonstrate its lack of control over them.  In December 1997, the United States Justice Department requested in writing that the Mexican government produce all "sketches and photographs of the crime scene"; in early 1998, FBI Special Agent Jimmy Garcia asked Mexican

-28-

officials several times to turn over all evidence in the case, only to be told that such evidence could not be relinquished because it was still under review; eight days before trial, Agent Garcia asked an official in the Mexico Attorney General's office to contact several Queretaro justice officials to help obtain the missing photographs, only to be told that all of the evidence had already been turned over to the U.S. government; one week before trial Agent Garcia asked each of the Mexican officials who were to testify as government witnesses about the photographs in hopes of locating them; and during trial, the FBI's Legate Office in Mexico made yet another request of the Mexican government to search for the missing photographs. Like the district court, we wonder "what else the United States Government could have reasonably done under the circumstances."

## V. THE SENTENCING ENHANCEMENT FOR FIRST DEGREE MURDER

Sentencing guideline § 2B3.2 sets the base offense level for extortion in violation of 18 U.S.C. § 1951. Section 2B3.2 contains a cross-reference provision, § 2B3.2(c)(1), which applies when the extortion scheme results in a murder that occurs outside the territorial or maritime jurisdiction of the United States. In particular, § 2B3.2(c)(1) states:

> If a victim was killed under circumstances
> that would constitute murder under 18 U.S.C.
> § 1111 had such killing taken place within
> the territorial or maritime jurisdiction of

the United States, apply § 2A1.1 (First Degree Murder).

Guideline § 2A1.1, in turn, describes the punishment for first degree murder in violation of 18 U.S.C. § 1111. Section 2A1.1 sets a base offense level of 43, which translates into life imprisonment pursuant to the sentencing table in the guidelines.

The district court sentenced Hughes to twenty years' imprisonment. It arrived at this sentence by applying the guideline for first degree murder, § 2A1.1, after determining that Hughes's extortion scheme resulted in the murder of McCarthy outside the territorial or maritime jurisdiction of the United States, and thus triggered the cross-reference found in § 2B3.2(c)(1). Pursuant to § 2A1.1's base offense level of 43, the district court would have sentenced Hughes to life imprisonment, but 18 U.S.C. § 1951 sets the maximum penalty for extortion at twenty years' imprisonment. See USSG § 5G1.1 ("Where the statutorily authorized maximum sentence is less than the minimum of the applicable guideline range, the statutorily authorized maximum sentence shall be the guideline sentence.").

Hughes argues that the district court erred in applying the § 2B3.2(c)(1) cross-reference for three reasons: (A) § 2B3.2(c)(1) is superceded by 18 U.S.C. § 1119; (B) there was insufficient evidence of first degree murder; and (C) McCarthy was not "a victim" of the extortion scheme within the meaning of

-30-

§ 2B3.2(c)(1).  Rejecting each of these arguments, we affirm Hughes's sentence.

**A.  The Relationship Between § 2B3.2(c)(1) and 18 U.S.C. § 1119**

Hughes argues that § 2B3.2(c)(1) is superceded by 18 U.S.C. § 1119.  Section 1119 provides that "[a] person who, being a national of the United States, kills or attempts to kill a national of the United States while such national is outside the United States but within the jurisdiction of another country shall be punished as provided under sections 1111 [murder], 1112 [manslaughter], and 1113 [attempted murder/manslaughter]."  Section 1119 also contains the following limitation:  "No prosecution shall be approved if prosecution has been previously undertaken by a foreign country for the same conduct."  Hughes insists that this limitation prevents calculating his sentence using § 2B3.2(c)(1)'s cross-reference to the first degree murder guideline because he was previously prosecuted for (and convicted of) murder in Mexico.  See supra note 1.  We disagree.

By its own terms, the limiting language within § 1119 speaks only of "prosecutions," not sentence enhancements.  Moreover, although § 1119 prohibits prosecuting a defendant for murder "as provided under section[] 1111," Hughes was not being prosecuted or punished for murder in violation of § 1111, but

-31-

for extortion in violation of § 1951.  If Hughes had been prosecuted and punished for murder, he would have received the death penalty or life imprisonment, see 18 U.S.C. § 1111, not twenty years' imprisonment, the statutory maximum for extortion.

It is well-established that a defendant's sentence may be enhanced pursuant to the sentencing guidelines for conduct underlying a prior prosecution, conviction, and punishment.  As the Supreme Court explained in Witte:

> To the extent that the Guidelines aggravate punishment for related conduct outside the elements of the crime on the theory that such conduct bears upon the "character of the offense," the offender is still punished only for the fact that the present offense was carried out in a manner that warrants increased punishment, not for a different offense (which that related conduct may or may not constitute).

Witte v. United States, 515 U.S. 389, 402-03 (1995).  This is true even where, as in this case, the defendant is subject to "separate prosecutions involving the same or overlapping 'relevant conduct'" Id. at 404 (emphasis added) (citation omitted).  The guidelines specifically contemplate multiple prosecutions for different offenses based on the same conduct.  See, e.g., USSG § 5G1.3(c).

**B.  Sufficiency of the Evidence of First Degree Murder**

Hughes contends that there was insufficient evidence to support the district court's finding that he murdered McCarthy within the meaning of 18 U.S.C. § 1111--i.e., that Hughes killed McCarthy with "malice aforethought." See 18 U.S.C. § 1111. Our review "of a sentencing court's fact-specific determination of a defendant's role in the offense is limited to clear error." United States v. Alicea, 204 F.3d 480, 485 (1st Cir. 2000).

First degree murder is "willful, deliberate, malicious, and premeditated killing." 18 U.S.C. § 1111. Hughes argues that the evidence equally supports a finding that he committed voluntary manslaughter--i.e., killing "[u]pon a sudden quarrel or heat of passion." 18 U.S.C. § 1112. The government, however, presented strong circumstantial evidence that Hughes planned to murder McCarthy when they met in Mexico. Hughes purchased a gun, devised a plan to transport it to Mexico, surveyed the area of the crime to choose a suitable location to kill McCarthy, and planned for McCarthy to arrive late at night. To sustain a sentencing enhancement, the government need only prove the relevant facts by a preponderance of the evidence. See United States v. Medina, 167 F.3d 77, 79 (1st Cir. 1999). The

district court did not commit clear error in finding that the government met its burden.[9]

## C. The Meaning of "A Victim" Within § 2B3.2(c)(1)

Arguing that the district court erred in determining that McCarthy was "a victim" of the extortion within the meaning of § 2B3.2(c)(1), Hughes encourages us to read that term narrowly to require that the "victim" be the target of the extortionate demand. We decline Hughes's invitation, concluding instead that § 2B3.2(c)(1) contemplates that there may be "victims" of an extortion scheme other than the target of the extortionate demand.

Application note 7 to § 2B3.2 explains that "[i]f the offense involved the threat of death or serious bodily injury to numerous victims (e.g., in the case of a plan to derail a passenger train or poison consumer products), an upward

_____

[9]Although the jury's conviction on the extortion charge required it to find as a factual predicate that Hughes killed McCarthy--i.e., that the two were not victims of a kidnapping and ransom scheme as Hughes had claimed--the jury need not have concluded that, as a legal matter, Hughes murdered McCarthy within the meaning of § 1111--that is, that he killed him with malice aforethought. Indeed, despite strong circumstantial evidence to the contrary, it is possible that the jury concluded that Hughes killed McCarthy without malice and, as such, only committed manslaughter. See 18 U.S.C. § 1112. Whatever the factual predicate the jury relied upon to convict Hughes, however, the evidence supported the sentencing court's finding by a preponderance of the evidence that, for the purpose of applying the § 2B3.2(c)(1) cross-reference, Hughes's conduct constituted first degree murder.

departure may be warranted." (Emphasis added.)  In this example, the train passengers are "victims" of the train derailment extortion scheme even though the extortionate demand is not made of the passengers themselves.  Likewise, because Hughes's plan to extort money from ASI included killing McCarthy, McCarthy was a victim of the extortion scheme even though Hughes never demanded that McCarthy pay him any money.

Additional support for this conclusion comes from the text of § 2B3.2.  Section 2B3.2(b)(2) adds levels to the base offense level for excessive "loss to the victim."  There, the use of the definite article "the" to indicate a narrower class of "victims" makes sense because only the target of the extortionate demand will suffer a financial "loss" as a result of the extortion scheme.  Section 2B3.2(c)(1) uses the indefinite article, referring the sentencing court to the first-degree murder guideline "[i]f a victim was killed under circumstances that would constitute murder under 18 U.S.C. § 1111."  In contrast to § 2B3.3(b)(2), the use of the indefinite article suggests a class of potential victims broader than the target or targets of the extortionate demand.

There are many precedents for a similar construction of the term "victim" in other guidelines sections.  The Fifth Circuit concluded that a person killed in the aftermath of a

bank robbery, though not the target of the robbery itself, was "a victim" within the meaning of § 2B3.1(c)(1).  See <u>United States</u> v. <u>Harris</u>, 104 F.3d 1465, 1474-75 (5th Cir. 1997) (construing a cross-reference provision identical to § 2B3.2(c)(1)).  Other courts have declined to construe the term "victim" narrowly, except where the guidelines employ the definite article.  See <u>United States</u> v. <u>Sickinger</u>, 179 F.3d 1091, 1094 (8th Cir. 1999) (emphasizing that "increases based on injury to '<u>the</u> <u>victim</u>' under sentencing guideline for kidnapping, abduction, unlawful restraint, § 2A4.1, are predicated on the risk to a <u>single</u> <u>intended</u> <u>individual</u>," and distinguishing "the victim" from the phrase "any victim" found in the robbery guideline) (internal quotation marks and citations omitted) (emphasis added); <u>United States</u> v. <u>Malpeso</u>, 115 F.3d 155, 170 (2d Cir. 1997) (under assault-with-intent-to-commit-murder guideline, § 2A2.1(b)(1), holding that phrase "the victim" refers only to a single intended victim of assault, and distinguishing provisions that employ the phrase "any victim"); <u>United States</u> v. <u>Sherwood</u>, 98 F.3d 402, 412-13 (9th Cir. 1996) (under USSG § 5K2.8, the kidnapped child, not just the father who was the target of the extortionate demand, was a "victim."); <u>United States</u> v. <u>Muhammmad</u>, 948 F.2d 1449, 1456 (6th Cir. 1991) (under robbery guideline, § 2B3.1(b)(3), adjustment referring to

-36-

"any victim" covered bystander injured during bank robbery despite defense argument that only the bank was the victim of the offense); United States v. Robertson, 872 F.2d 597, 604-05 (5th Cir. 1989) (under USSG § 5K2.8, interpreting "victim" to include indirect victims of the offense).

We conclude, therefore, that the district court properly determined that McCarthy was a victim within the meaning of § 2B3.2(c)(1), and correctly calculated Hughes's sentence using the cross-reference to the first-degree murder guideline.[10]

## VI.   THE RESTITUTION ORDER

The district court also ordered that Hughes "pay full restitution to the Hartford Insurance Company" in an amount of $123,100, plus additional amounts paid by the insurance company to McCarthy's widow until Hughes is released from prison. Hughes argues that the district court's order to pay restitution

---

[10]We note that the district court indicated that even if the cross-reference provision of § 2B3.2(c)(1) did not apply, it would have sentenced Hughes to twenty years' imprisonment. The court explained:

> [T]he murder here is relevant conduct that takes this case outside of the Heartland of the run of the mill extortion case and therefore would be ample grounds for an upward departure. . . . [I] don't think it is debatable that the court should go to, at least, to level thirty-seven which would trigger the twenty year maximum sentence under the statute.

was "fatally flawed" because it failed to take into account his inability to pay. We disagree.

"We have repeatedly pointed out that the provision addressing restitution, [the former] 18 U.S.C. § 3664(a) (1994), does not require an explicit finding that the defendant has the ability to pay the restitution ordered. Rather, it is sufficient if the record on appeal reveals that the judge made implicit findings or otherwise adequately evinced his consideration of those factors."[11] United States v. LiCausi, 167 F.3d 36, 52 (1st Cir.), cert. denied, 120 S. Ct. 79 (1999) (internal quotation marks and citations omitted). A district court adequately considers the defendant's ability to pay if the defendant's financial information is contained in the presentence report (PSR), and the district court relies on the PSR in issuing its restitution order. See United States v. Newman, 49 F.3d 1, 10 (1st Cir. 1995); United States v. Ahmad, 2 F.3d 245, 246 (7th Cir. 1993). Although Hughes claimed to have no assets, the PSR reflects that between 1974 and 1994, he earned an aggregate salary of over $2 million. Moreover, as a talented software designer, Hughes has substantial human

---

[11]The most recent version of § 3664 provides that the sentencing court "shall order restitution . . . without consideration of the economic circumstances of the defendant." 18 U.S.C. § 3664(f)(1)(A) (Supp. II 1996).

capital, and there was evidence presented at trial that Hughes owned stock options and had recently purchased a house in Mexico.  The district court did not err in ordering restitution.

**Affirmed.**