# United States Court of Appeals
## For the First Circuit

No. 99-1024

UNITED STATES OF AMERICA,

Plaintiff, Appellee,

v.

LUIS MANUEL PEÑA-LORA,

Defendant, Appellant,

No. 99-1236

UNITED STATES OF AMERICA,

Plaintiff, Appellee,

v.

JORGE LORENZO-HERNÁNDEZ,

Defendant, Appellant,

No. 99-1237

UNITED STATES OF AMERICA,

Plaintiff, Appellee,

v.

THOMAS LORENZO-PÉREZ,

Defendant, Appellant,

No. 99-1238

UNITED STATES OF AMERICA,

Plaintiff, Appellee,

v.

LORENZO PEÑA-MORFE,

Defendant, Appellant.

_____

APPEALS FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF PUERTO RICO

[Hon. Salvador E. Casellas, U.S. District Judge]

_____

Before

Selya, Circuit Judge,

Cyr, Senior Circuit Judge,

and Stahl, Circuit Judge.

_____

Rafael F. Castro-Lang, with whom Graham A. Castillo and Luz M. Rios-Rosario were on brief for appellant Lorenzo-Pérez.
Luz M. Ríos-Rosario, with whom Rafael F. Castro-Lang and Graham A. Castillo were on brief for appellant Peña-Morfe.
Graham A. Castillo, with whom Rafael F. Castro-Lang and Luz M. Ríos-Rosario were on brief for appellant Peña-Lora.
Michael J. Cruz for appellant Lorenzo-Hernández.
Michelle Morales, Assistant United States Attorney, with whom Guillermo Gil, United States Attorney, and Jorge E. Vega-Pacheco, Assistant United States Attorney, were on brief for appellee.

_____

3

September 1, 2000

---

**CYR, <u>Senior Circuit Judge</u>.** Appellants challenge the convictions and sentences imposed for their respective roles in an armed hostage-taking which took place in the District of Puerto Rico in 1997. For the most part, <u>but</u> <u>see</u> <u>infra</u> Sections II.A.2.b & II.D, their appeals fail.

**I**

**<u>BACKGROUND</u>**

On August 17, 1997, appellant Peña-Morfe and a person called "Charlie" abducted Richardson Leo Mieses-Pimentel at gunpoint as he was leaving the Chris Café, a place of business owned by his family. The abductors placed a hood over the victim's head, handcuffed him, and transported him to a private residence, where he was interrogated regarding his family's financial resources, then informed that his abductors intended to demand a $500,000 ransom from the family. Throughout the ensuing ten-day captivity, Mieses-Pimentel was continually blindfolded, forcibly restrained (<u>i.e.</u>, handcuffed in a bathtub or chained to a bed), and repeatedly threatened with death. Following three days of captivity at the initial site, during which the captors unsuccessfully phoned Mieses-Pimentel's family to negotiate a ransom, another accomplice — Santiago Acosta-Molina — was recruited and Mieses-Pimentel was relocated at nighttime to the Acosta-Molina residence.

5

During the ensuing captivity, Acosta-Molina observed Peña-Morfe, Lorenzo-Pérez and Peña-Lora toting various weapons, including revolvers, while placing phone calls to Mieses-Pimentel's family. At one point, Lorenzo-Pérez threatened the newly recruited accomplice, Acosta-Molina, with an UZI submachine gun, which he referred to as "The Silencer" used "for the people who talk." Throughout this period of captivity, the three defendants repeatedly assaulted Acosta-Molina with blows to the face and chest.

Three days later, at Acosta-Molina's insistence, the original captors relocated Mieses-Pimentel to a residence in Barrio Obrero, informing him that he was being taken to the place where he would be killed. Upon arrival at this third residence, Mieses-Pimentel was handcuffed, blindfolded, and chained to a bed in a rear bedroom.

At about the same time, an INS agent recognized Peña-Morfe's voice from an FBI tape of a ransom call to the victim's family. After arranging a meeting with Peña-Morfe, the INS agent placed him under arrest. Peña-Morfe admitted his participation in the abduction and led the FBI to the third residence, where Mieses-Pimentel was being held hostage.

An FBI SWAT team surrounded the residence, demanding that its occupants surrender. At this point in time — having

6

been relieved of the blindfold and handcuffs by his captors —
Mieses-Pimentel saw someone running toward the rear of the
residence carrying firearms (including a machinegun). Then he
was escorted to a different room at the rear of the residence,
where he remained in the custody of appellant Lorenzo-Hernández,
Raimary Lavandier (who was carrying a baby), and a male youth
whose identity was not disclosed at trial.

Ultimately, Raimary Lavandier and the unidentified male
youth abandoned Mieses-Pimentel, exited the residence, and
submitted to arrest by the FBI. A subsequent search disclosed
two revolvers and an UZI machinegun secreted in the backyard of
the residence.

The four appellants, as well as Acosta-Molina and
Lavandier, were indicted for conspiring to commit a hostage-
taking for ransom (Count 1), see 18 U.S.C. § 1203 (a), and for
aiding and abetting the hostage-taking (Count 2), see id. & § 2.[1]

---

[1]The statute provides:

> [W]hoever, whether inside or outside the
> United States, seizes or detains and
> threatens to kill, to injure, or to continue
> to detain another person in order to compel
> a third person or a governmental
> organization to do or abstain from doing any
> act as an explicit or implicit condition for
> the release of the person detained, or
> attempts or conspires to do so, shall be
> punished by imprisonment for any term of
> years or for life and, if the death of any

7

Peña-Morfe and Lorenzo-Pérez jointly were charged with using or carrying firearms during and in relation to a crime of violence (viz., the hostage-taking) (Count 3).  See 18 U.S.C. § 924(c)(1).[2] Finally, Peña-Morfe, Lorenzo-Hernández, and Lorenzo-Pérez were jointly charged, in Count 4, with using or carrying three weapons:  two .357 revolvers and an Israeli semiautomatic 9 mm UZI.  See id. § 924(c)(1) & (2).  Pursuant to a plea

_____

person results, shall be punished by death or life imprisonment.

18 U.S.C. § 1203(a).

[2]The statute provides, in pertinent part:

[A]ny person who, during and in relation to any crime of violence or drug trafficking crime (including a crime of violence or drug trafficking crime that provides for an enhanced punishment if committed by the use of a deadly or dangerous weapon or device) for which the person may be prosecuted in a court of the United States, uses or carries a firearm, or who, in furtherance of any such crime, possesses a firearm, shall, in addition to the punishment provided for such crime of violence or drug trafficking crime . . . be sentenced to a term of imprisonment of not less than 5 years . . . . If the firearm possessed by a person convicted of a violation of this subsection . . . is a machinegun or a destructive device, or is equipped with a firearm silencer or firearm muffler, the person shall be sentenced to a term of imprisonment of not less than 30 years.

18 U.S.C. § 924(c).

8

agreement with the government, Acosta-Molina was required to testify against appellants at trial.

A superseding indictment modified the firearm counts as follows:  Count 4 charged Peña-Lora with using or carrying a firearm; Count 5 charged Lorenzo-Hernández and Lorenzo-Pérez with using or carrying firearms, "specifically a fully-automatic 9 millimeter UZI, serial number UP00514, as defined in 18 U.S.C., Section 921(a)(23) and 26 U.S.C., Section 845(b), a Ruger .357 revolver, serial number 153191995, and a Smith & Wesson .357 revolver, serial number 90922c-19"; Count 6 charged Raimary Lavandier with failing to report and/or concealing a federal crime.  See 18 U.S.C. § 4.

After Acosta-Molina and Mieses-Pimentel testified for the government at trial, guilty verdicts were returned against each defendant on every count charged in the superseding indictment.  Following sentencing, Peña-Morfe, Lorenzo-Pérez, Lorenzo-Hernández, and Peña-Lora filed timely notices of appeal from their respective convictions and sentences.

**II**

## DISCUSSION

### A.  Sufficiency of the Evidence

Appellants claim the government failed to present sufficient evidence to establish either the hostage-taking or

9

firearms counts.  See Fed. R. Crim. P. 29; supra notes 1 & 2. We must affirm the jury verdicts unless the evidence and all reasonable inferences, viewed in the light most favorable to the government's case, would not enable a rational jury to find each element of the charged offenses beyond a reasonable doubt, see United States v. Hughes, 211 F.3d 676, 681 (1st Cir. 2000), even though the prosecution may not have "'present[ed] evidence that preclude[d] every reasonable hypothesis inconsistent with guilt.'"  Id. (citation omitted).

### 1. Peña-Morfe, Lorenzo-Pérez and Peña-Lora

Peña-Morfe, Lorenzo-Pérez and Peña-Lora acknowledge that cooperating defendant Acosta-Molina presented graphic eyewitness testimony unambiguously identifying and implicating each of them in the hostage-taking.  Moreover, Acosta-Molina unambiguously linked each to the use or carrying of the various firearms.  Accordingly, these three defendants are limited to the familiar appellate refrain that their trial jury rationally could not have credited the testimony given by Acosta-Molina since he had every incentive to prevaricate in order to gain favorable treatment from the government because he is a confessed hostage-taker himself.

With rare exceptions, it is the jury — rather than an appellate court — which must assess witness credibility.  See

<u>United States</u> v. <u>Cruz</u>, 156 F.3d 22, 27 (1st Cir. 1998), <u>cert. denied</u>, 526 U.S. 1124 (1999). "'[A] conviction based solely upon the uncorroborated testimony of an accomplice can be upheld, as long as the jury is properly instructed and the testimony is not incredible as a matter of law.'" <u>United States</u> v. <u>LiCausi</u>, 167 F.3d 36, 47 (1st Cir.) (citation omitted), <u>cert. denied</u>, 120 S. Ct. 79 (1999).

Additionally, Acosta-Molina was subjected to vigorous cross-examination and the government acknowledged in its closing argument that he was a confessed hostage-taker, thus emphasizing that the jury must carefully weigh his credibility. <u>See</u> <u>id.</u> ("[A]n accomplice is qualified to testify as long as any agreements he has made with the government are presented to the jury and the judge gave complete and correct instructions detailing the special care the jury should take in assessing the testimony.") (internal quotation marks and citations omitted).[3]

Moreover, the government also adduced independent evidence corroborating the Acosta-Molina testimony. For instance, an INS agent recognized Peña-Morfe's voice from the

---

[3]The district court correctly instructed the jury that Acosta-Molina was "providing evidence under a plea and cooperation agreement with the government . . . [and] [w]hile some people in this position are entirely truthful when testifying, you should consider the testimony of these persons with particular caution."

tapes made of the ransom calls, which were played for the jury at trial. See United States v. Flores-Rivera, 56 F.3d 319, 324 (1st Cir. 1995). The agent also took Peña-Morfe's post-arrest confession, after which Peña-Morfe led the FBI to the residence where Mieses-Pimentel was being held. On another tape, an abductor was referred to as "Luis" — the first name of defendant Peña-Lora. Similarly, Mieses-Pimentel testified that he overheard one of his captors become extremely upset when a cohort inadvertently referred to him as "Luis," rather than by his alias.

Accordingly, the sufficiency challenges relating to the hostage-taking and firearms counts against these three appellants fail.

## 2. **Lorenzo-Hernández**

The sufficiency challenges asserted by Lorenzo-Hernández are more problematic for the government.[4] Although he concedes that the government established that he was in the house on the morning the FBI rescued Mieses-Pimentel, he maintains that his actions proved nothing more than "mere presence" at the scene of the crime, rather than knowing participation in the abduction. See, e.g., United States v. Cruz-Paulino, 61 F.3d 986, 1001 (1st Cir. 1995) (noting that "mere presence" at crime scene normally is insufficient to establish knowing participation in offense). Accordingly, Lorenzo-Hernández contends that the jury rationally could not have inferred from the available evidence that he had the requisite specific intent to commit either the hostage-taking or the firearm offenses. See id.

---

[4]Although Acosta-Molina actually participated in the hostage-taking with the three other appellants, he did not implicate Lorenzo-Hernández, whom he did not meet until after his arrest. In rejecting Lorenzo-Hernández's motion for judgment of acquittal, the district court downplayed this fact, however, because Lorenzo-Hernández's alleged role in the conspiracy did not commence until after Mieses-Pimentel had been relocated from the Acosta-Molina residence. Nonetheless, it is significant that Acosta-Molina testified that he had visited the third residence after Mieses-Pimentel was taken there. Acosta-Molina testified that he met Peña-Morfe and others there, but made no mention of Lorenzo-Hernández.

A close review of the entire trial record discloses: (a) ample evidence that Lorenzo-Hernández intended to participate in the hostage-taking; and (b) insufficient evidence for the firearm conviction under Count 5.

### a.    The Evidence

The entire case against Lorenzo-Hernández rests on Mieses-Pimentel's eyewitness testimony concerning the events on the final morning of his captivity, after the FBI had surrounded the third residence at which he had been held hostage. Accordingly, we scrutinize the trial testimony provided by Mieses-Pimentel.

Government counsel asked Mieses-Pimentel who had been present during his three-day captivity at the third residence. Mieses-Pimentel responded that he had heard the voices of a female, a baby, and "two male[s]." During that time, Mieses-Pimentel was continuously blindfolded and chained to a bed in the rear of the house. These same "two male[s]" — though not the female — had come into the bedroom on a regular basis throughout his captivity, to bring food and escort him to the bathroom.

On the morning the FBI surrounded the house and called for its occupants to surrender, one of these two males (we shall refer to him as "Male A") hurriedly entered the rear bedroom,

14

told Mieses-Pimentel to be silent, removed his blindfold and handcuffs, then relocated him to another room at the rear of the house.

At trial, Mieses-Pimentel perfunctorily described Male A as "a younger guy with a dark complexion." Government counsel then asked Mieses-Pimentel: "What else did [you] see?" — presumably, when Mieses-Pimentel reached the other room at the rear of the residence. To which Mieses-Pimentel responded: "the other person, he was a young guy" (Male B?), the female, and the baby. Government counsel then asked Mieses-Pimentel whether he could identify "any of these people in the courtroom today." Whereupon Mieses-Pimentel pointed out Raimary Lavandier and "the person sitting next to her," whom government counsel identified as Lorenzo-Hernández.

The ensuing testimony from Mieses-Pimentel exhibits a glaring inconsistency, however. When asked what "the other individual that you have identified sitting next to [Raimary Lavandier]" — viz., in the courtroom, i.e., Lorenzo-Hernández — had done once Mieses-Pimentel had been relieved of the blindfold and handcuffs, Mieses-Pimentel replied: "He was the one that took me to the back room and told me to sit down and to act like I was one of them."

15

At first blush, the quoted testimony suggests that Lorenzo-Hernández was Male A, identified earlier by Mieses-Pimentel, see supra, as the only individual who had entered the rear bedroom after the FBI arrived. However, when government counsel asked Mieses-Pimentel whether the individual who had removed the blindfold was present in the courtroom, Mieses-Pimentel responded: "[n]o," notwithstanding the fact that he had testified earlier that a single individual — i.e., Male A — had removed both his blindfold and the handcuffs, then escorted him from the rear bedroom to a different room in the rear of the residence.

Rather than resolving this testimonial discrepancy, however, government counsel asked Mieses-Pimentel to describe the scene he encountered upon arriving in the other room at the rear of the residence. Mieses-Pimentel responded that the four persons who were in the room with him were "real nervous," and the "girl" (viz., Lavandier) started to cry. "The other person that is not here today . . . got up and ran outside the room," followed shortly thereafter by the woman carrying the baby. (Emphasis added.) "The other person who was sitting next to her [viz., in the rear room, i.e., Lorenzo-Hernández] . . . ask[ed] [Mieses-Pimentel] not to move around too much in case the FBI came inside they would think he was looking for a gun and shoot

16

us right there." Lorenzo-Hernández then "got up and ran outside and . . . left [Mieses-Pimentel] sitting there by [himself]."

When government counsel asked whether Mieses-Pimentel had seen any weapons "[a]fter the blindfold was removed[,]" he answered: "Yes, before they took me in the room [i.e., the rear room to which he was relocated] I saw the other person. He was running towards the back of the house and carrying some weapons in his hands." (Emphasis added.) Mieses-Pimentel identified these weapons as "a small machine gun" and the two firearms used to abduct him from the Chris Café.

With respect to the sufficiency challenges to the Lorenzo-Hernández convictions on the hostage-taking counts, see 18 U.S.C. § 1203(a), the government touts three items of supportive evidence: the Mieses-Pimentel testimony that (1) Lorenzo-Hernández was one of the "males" who regularly brought him food in the rear bedroom during the three-day captivity at the third residence; (2) Mieses-Pimentel saw Lorenzo-Hernández running with the weapons toward the rear of the house on that morning, after the blindfold had been removed from Mieses-Pimentel; and (3) Lorenzo-Hernández was the person who had removed the blindfold and the handcuffs, escorted him from the rear bedroom to the other rear room, and told him to act like one of them.

17

### b.    Count 5:   Carrying Firearms

In relation to the Count 5 conviction for carrying firearms, see 18 U.S.C. § 924(c), the government relies on the trial testimony that Mieses-Pimentel saw Lorenzo-Hernández run with the weapons toward the rear of the house, whereas Lorenzo-Hernández claims that Mieses-Pimentel never identified "who that person was."  As the record reflects that Lorenzo-Hernández failed to preserve this claim in the district court,[5] we review the present challenge to the sufficiency of the evidence only for plain error, see United States v. Upham, 168 F.3d 532, 537 (1st Cir. 1999) ("Sufficiency of the evidence objections are waived, if not made below . . . ."). Moreover, we will not reverse unless the conviction under Count 5 would result in a "clear and gross injustice." United States v. Bello-Perez, 977 F.2d 664, 668 (1st Cir. 1992); see Upham, 168 F.3d at 537 (noting that the Olano plain-error test envisions clear showings

---

[5]Lorenzo-Hernández's trial counsel advanced differing theories in the Rule 29 motion than in his closing argument. See United States v. Dandy, 998 F.2d 1344, 1356-57 (6th Cir. 1993) ("Although specificity of grounds is not required in a Rule 29 motion, where a Rule 29 motion is made on specific grounds, all grounds not specified are waived."). In fashioning his "mere presence" defense, counsel allowed that Mieses-Pimentel did identify his client as "the other person" running towards the rear of the house with the weapons, see infra, but contended that Mieses-Pimentel's testimony was not credible because, inter alia, no law enforcement officer had seen anyone leave the residence and conceal guns in the backyard.

18

that the evidence was obviously insufficient and seriously affected the defendant's substantial rights, as well as the fairness or integrity of the trial process) (citing <u>United States</u> v. <u>Olano</u>, 507 U.S. 725, 732-33 (1993)); <u>see</u> <u>also</u> <u>United States</u> v. <u>Todosijevic</u>, 161 F.3d 479, 482 (7th Cir. 1998) ("'[R]equirements for plain error are met with respect to sufficiency of the evidence claims 'if the record is devoid of evidence pointing to guilt, or if the evidence on a key element was so tenuous that a conviction would be shocking.'") (citation omitted).

Notwithstanding the highly deferential standard of review, the conviction against Lorenzo-Hernández under Count 5 must be set aside. The case against Lorenzo-Hernández under Count 5 depended <u>entirely</u> upon the identification Mieses-Pimentel made of the person he saw carrying weapons shortly after law enforcement officers arrived on the premises. Contrary to the government's contention, Mieses-Pimentel did not identify Lorenzo-Hernández as the person whom he saw carrying firearms on that occasion.[6] Rather, on direct examination

---

[6]The government acknowledges that it adduced no evidence that Lorenzo-Hernández ever "used" these firearms. <u>See</u> <u>Bailey</u> v. <u>United States</u>, 516 U.S. 137, 143 (1995) ("using" element under § 924(c) contemplates proof that particular defendant "actively employed" weapon). Thus, it relied exclusively on the theory that Lorenzo-Hernández "carried" or transported the weapons on this occasion. <u>See</u> <u>United States</u> v. <u>Cleveland</u>, 106 F.3d 1056,

19

Mieses-Pimentel referred to the gun-carrier as "the other person," and on cross-examination simply as "someone."

We cannot reliably determine, within the context of the Mieses-Pimentel testimony, whether the term "the other person" adverted to Lorenzo-Hernández or to the second unidentified male youth who was in the house on the morning in question, but not in the courtroom during the trial testimony given by Mieses-Pimentel.[7]  Since Mieses-Pimentel, in his immediately preceding testimony, twice used the phrase "other person," plainly referring to a different individual on each occasion, the following question — critical to the government's case — went unanswered:  the person "[o]ther" than whom?  We explain.

First, Mieses-Pimentel testified that "[t]he other person who is not here [in the courtroom] today" — i.e., plainly someone other than Lorenzo-Hernández - "had been the first to run out of the rear room and surrender to the FBI. . . ."  Second, he stated that "the other person who was sitting next to [the female and baby] . . . [who] ask[ed] him not to move around too much" was the last to leave the room, leaving Mieses-

1066-67 (1st Cir. 1997) (aff'd, 524 U.S. 125 (1998) ("carrying" element of § 924(c) is satisfied by proof that defendant transported firearm either in a vehicle or on person).

[7]The record suggests, however, that the unidentified second male was an unindicted minor.

20

Pimentel by himself. Therefore, the latter person had to have been Lorenzo-Hernández, because only he could have been present both at the time of the FBI raid and during the trial testimony given by Mieses-Pimentel.

Consequently, we can discern no rational means by which the trial jury could have determined, beyond a reasonable doubt, whether the "other person," whom Mieses-Pimentel testified to having seen carrying the firearms toward the rear of the residence where Mieses-Pimentel was being held hostage, was Lorenzo-Hernández or the unidentified male minor.

The latent inconsistency in the Mieses-Pimentel testimony — as to whether one or two persons removed the blindfold and escorted him from the rear bedroom — undermines the jury verdict on Count 5 as well. If (as Mieses-Pimentel initially testified) Male A came into the rear bedroom, told Mieses-Pimentel to be quiet, took off the blindfold and handcuffs, and escorted Mieses-Pimentel to another room in the rear of the house, and if (as Mieses-Pimentel later testified) Lorenzo-Hernández was the person who escorted him from the rear bedroom to the other room in the rear of the residence, then it would appear highly implausible, if not physically impossible, that Lorenzo-Hernández was also the gun carrier described in the trial testimony given by Mieses-Pimentel. This is because

21

Mieses-Pimentel saw the gun carrier just after his blindfold had been removed, but before Mieses-Pimentel was escorted to the other room in the rear of the residence.

Accordingly, the evidence strongly suggests that Male B — rather than Lorenzo-Hernández — was the "other person" whom Mieses-Pimentel observed carrying the weapons while Lorenzo-Hernández simultaneously relocated Mieses-Pimentel to another room in the rear of the residence. Moreover, the government invited these testimonial inconsistencies from Mieses-Pimentel, and absent any follow-up clarification by government counsel the jury plainly lacked a rational foundation for determining which version of these critical events was to be credited. See United States v. Morillo, 158 F.3d 18, 22 (1st Cir. 1998) ("If the evidence viewed in the light most favorable to the verdict gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence of the crime charged, [we] must reverse the conviction. This is so because . . . where an equal or nearly equal theory of guilt and a theory of innocence is supported by the evidence viewed in the light most favorable to the prosecution, a reasonable jury must necessarily entertain a reasonable doubt.") (internal quotation marks and citations omitted). Given the state of the trial record, therefore, the

jury determination as to the identity of the gun carrier can only have been based on sheer speculation.

Although the trial participants assumed throughout that Mieses-Pimentel positively identified Lorenzo-Hernández as the gun-toter, the record is totally "devoid of evidence pointing to [Lorenzo-Hernández's] guilt [on Count 5]," and the government's "'evidence on [that] key element was so tenuous that a conviction would be shocking.'" Todosijevic, 161 F.3d 479, 482 (citation omitted).[8]  Nor can these deficiencies in the government's "linchpin" evidence be considered inconsequential,

---

[8]We note as well that customary appellate review and plain-error review of "sufficiency" challenges differ only negligibly where the failure of proof on an essential element of the offense is total. See United States v. Dawlett, 787 F.2d 771, 775 (1st Cir. 1986) ("'It is the imperative duty of a court to see that all the elements of [a] crime are proved, or at least that testimony is offered which justifies a jury finding those elements.'  In this instance the insufficiency of the evidence mandates reversal since plain error has been committed in an area so vital to the defendant.  Surely our concept of justice is violated when a man is convicted of a crime he did not commit.") (citation omitted); United States v. Spinner, 152 F.3d 950, 956 (D.C. Cir. 1998) (finding plain error despite unpreserved sufficiency challenge, since "[i]t would be a manifest miscarriage of justice to let a conviction stand [where] the government failed to present any evidence on an essential element of the crime"); Beckett v. United States, 379 F.2d 863, 864 (9th Cir. 1967) (finding plain error despite defendant's waiver of sufficiency challenge where "there was no proof of one of the essential elements [of the charged offense]"); accord United States v. Meadows, 91 F.3d 851, 855 n.6 (7th Cir. 1996) (noting, in dicta, that "a complete lack of any evidence of one of the essential elements of a crime is not only insufficient evidence, but too little evidence to avoid a manifest miscarriage of justice").

since the section 924(c)(1) conviction exposed Lorenzo-Hernández to a mandatory thirty-year prison term, see supra note 2, nearly trebling the eleven-year sentence imposed for his hostage-taking convictions under Counts 1 and 2.  As the conviction under Count 5 constituted plain error, it may not stand.

c.    **The Hostage-taking Counts**

The sufficiency challenge under the hostage-taking counts poses a more formidable hurdle for Lorenzo-Hernández. Although there was insufficient evidence that he toted a weapon, the record clearly reflects that the jury acted well within its prerogative in finding that Lorenzo-Hernández was not "merely present" at the hostage-scene, but knowingly participated in the related conspiracy.

Mieses-Pimentel was held hostage for three days at the third residence, where he remained blindfolded and chained, which meant that two males had to bring his meals and respond to his "scream[s]" to use the bathroom.[9]  Yet more importantly, Mieses-Pimentel testified that the <u>same</u> two males attended him throughout his captivity at the third residence.  Furthermore, he not only identified Lorenzo-Hernández as one of the two males remaining at the third residence on the final morning, but gave no indication whatsoever that any other male resided continually in the third residence.

---

[9]Mieses-Pimentel also testified that Lorenzo-Hernández gave him what the jury may have construed as an order.  That is, when Lorenzo-Hernández and Mieses-Pimentel were left alone in the rear room after Raimary Lavandier and the second male fled the house, Lorenzo-Hernández told Mieses-Pimentel not to move around "in case the FBI came inside they would think he was looking for a gun and shoot us right there."

25

The circumstantial evidence thus strongly supported a reasonable inference that Lorenzo-Hernández was not only a long-term resident, but one of the two males residing in the house throughout Mieses-Pimentel's captivity, and that he participated in the hostage-taking, at the very least as the victim's guard and attendant. See, e.g., United States v. Echeverri, 982 F.2d 675, 678 (1st Cir. 1993) (rejecting "mere presence" defense, as criminal activity took place in defendant's residence, where he enjoyed "dominion and control"); United States v. Lopez, 944 F.2d 33, 39 (1st Cir. 1991) (same); cf. United States v. Batista-Polanco, 927 F.2d 14, 18 (1st Cir. 1991) ("[I]t runs counter to human experience to suppose that criminal conspirators would welcome innocent nonparticipants as witnesses to their crimes.").

Therefore, in light of all the record evidence, the verdicts against Lorenzo-Hernández on Counts 1 and 2 must be affirmed, while the conviction under Count 5 must be vacated.

**B.   Failure to Employ Special Verdict Form for Count 5**

Lorenzo-Pérez contends that the district court erred in failing to provide a special verdict form in relation to Count 5 — charging that he used and carried firearms (viz., a 9 mm UZI, Ruger .367 revolver, and Smith & Wesson .357 revolver) during the kidnaping — which would have required the jury to

indicate precisely <u>which</u> of the three weapons he used or carried.[10] The district court later sentenced Lorenzo-Pérez to a consecutive thirty-year prison term under Count 5, on the understanding that the jury must necessarily have been satisfied that he used or carried the UZI (<u>i.e.</u>, a "machinegun"), whereas his use of the two revolvers (<u>i.e.</u>, mere "firearm[s]") would have resulted in only a five-year prison-term enhancement. <u>See</u> 18 U.S.C. § 924(c)(1); <u>supra</u> note 2 (describing pertinent sentencing enhancements).

As it was never raised below, we review the present claim for plain error, employing the four-step inquiry prescribed in <u>Olano</u>. <u>See</u> <u>United States</u> v. <u>Hernandez-Albino</u>, 177 F.3d 33, 37-38 (1st Cir. 1999) (citing <u>United States</u> v. <u>Olano</u>, 507 U.S. 725, 732-33 (1993)):

> First, an error must have been committed. Second, the error must be plain or obvious. Third, the plain error must "affect[] substantial rights," which generally means that it must have been prejudicial. Finally, because Rule 52(b) is discretionary, we must be convinced that the error "'seriously affect[s] the fairness, integrity or public reputation of judicial proceedings.'"

<u>Id.</u> (citations omitted).

_____

[10]Although Lorenzo-Hernández raises the same claim in his brief, our vacatur of his conviction under Count 5 moots the claim, <u>see</u> <u>supra</u> Section II.A.2.b.

Lorenzo-Pérez predicates the present claim on <u>United States</u> v. <u>Melvin</u>, 27 F.3d 710 (1st Cir. 1994), where the defendants were jointly charged under section 924(c)(1) with using or carrying six weapons, some of which were "firearms," whereas others were "machineguns" implicating the thirty-year prison term. The defendants unsuccessfully sought a special verdict form which would have required the jury to specify which of the weapons the individual defendants used or carried. Instead, the district court instructed the jury that though the firearm count listed the six weapons conjunctively, rather than disjunctively, thereby apparently permitting the jury to convict only if it were to find that the defendants had used all six weapons, the jury should read the "and" as "or," and could convict each defendant if it were to find that each had used or carried "any one firearm" listed. <u>See</u> <u>id.</u> at 713-14. The jury returned a general verdict finding defendants guilty under Count 5.

At sentencing, the government urged the district court to impose the enhanced thirty-year prison term. Acknowledging that it could not divine from the general verdict form whether the jury had found that any defendant had used a "machinegun," the district court declined. We affirmed. <u>See</u> <u>id.</u> at 715 "([T]he court's instruction explicitly permitted the jury . . .

28

[to] suspend[] their deliberations on the use of firearms once they concluded that these experienced criminals must have carried at least a single gun . . . ."). Nonetheless, Melvin is unavailing to Lorenzo-Pérez, since the claim of error was duly preserved in Melvin, whereas the present claim must be reviewed for "plain error" in accordance with Olano, supra.

Furthermore, unlike the district court in Melvin, the district court below did not instruct the jury to read "and" as "or." Instead, the indictment in the present case emphatically phrased Count 5 in the conjunctive (i.e., "using and carrying firearms, specifically, a 9 mm UZI,. . . a Ruger .367 revolver, . . . and a Smith & Wesson .357 revolver") (emphasis added). Accordingly, the district court correctly instructed the jury that there are two elements in subsection 924(c): (i) each defendant committed a crime of violence (i.e., the hostage-taking), and (ii) "during and in relation to the commission of that crime, the defendant knowingly used or carried a firearm." (Emphasis added.)

Lorenzo-Pérez nevertheless insists that the jury charge given below necessarily overrode the explicit conjunctive phrasing utilized in Count 5. We do not agree. Instead, the challenged instruction clearly informed the jury that it could not convict any defendant under Count 5 if it were to find that

29

the defendant neither used nor carried any weapon.  As the instruction accurately defined the applicable law, the present claim of error fails.

Lorenzo-Pérez suggests that other language in Melvin mandates special verdict forms in these cases; thus, the omission must be considered "obvious."  On the contrary, Melvin simply rejected the government's contention that our decisions severely circumscribe recourse to special verdict forms in criminal cases.  Moreover, we noted that the district courts are vested with discretion to employ special verdict forms in these cases — i.e., where a section 924(c) count lists both a regular "firearm" and a "machinegun."  See Melvin, 27 F.3d at 716 n.10. The term "discretionary" rationally cannot be redefined as "mandatory."  Thus, although Melvin vests district courts with the requisite discretion, Lorenzo-Pérez failed to request a special verdict form, thereby forfeiting any opportunity to satisfy the first two Olano criteria.

Furthermore, the evidence overwhelmingly demonstrated that Lorenzo-Pérez used or carried the UZI.  For instance, Acosta-Molina testified that Lorenzo-Pérez threatened him with the UZI, calling it "The Silencer" for "people who talk."  The UZI was recovered after Mieses-Pimentel had been rescued.  Since the jury — even assuming it had been provided with a special

30

verdict form — undoubtedly would have found that Lorenzo-Pérez used or carried the UZI during the Mieses-Pimentel hostage-taking, any possible error in failing to provide a special verdict form on Count 5 would not have "'seriously affect[ed] the fairness, integrity or public reputation of [these] judicial proceedings.'" Hernandez-Albino, 177 F.3d at 38 (citations omitted); see, e.g., United States v. Edgar, 82 F.3d 489, 510 n.15 (1st Cir. 1996) (finding no "plain error," in view of "strong evidence of guilt," even though an element of the crime was not made known to the jury).

Next, Lorenzo-Hernández raises the distinct, though related, claim that the district court erred in failing to define the term "machinegun," as used in subsection 924(c), so as to enable the jury to determine whether the UZI qualified. Cf. supra note 10. Following oral argument before this court, the United States Supreme Court held that the statutory sentencing enhancement for using or possessing a machinegun is an element of the offense, for determination by the jury, rather than simply a sentencing factor for determination by the district court. Castillo v. United States, __ U.S. __, 120 S. Ct. 2090, 2092 (2000). Although Lorenzo-Pérez has not raised this claim in his appellate brief, he did note Castillo in an informative motion.

We reject the resort to <u>Castillo</u> for several reasons, <u>see</u> Fed. R. App. Proc. 28(j), even assuming Lorenzo-Pérez may claim any benefit conferred by <u>Castillo</u>.  <u>See</u> <u>United States</u> v. <u>Randazzo</u>, 80 F.3d 623, 631 (1st Cir. 1996) (generally, appellants entitled to apply law prevailing at time of appeal, rather than time of trial).  Plain-error review applies to the present claim, even though the prevailing practice in the First Circuit at the time of the trial in the instant case was to treat the "machinegun" issue as a sentencing factor for resolution by the district court, rather than an element of the offense for jury determination.  <u>See</u> <u>Johnson</u> v. <u>United States</u>, 520 U.S. 461, 467-68 (1997).

In all events, <u>Melvin</u> explicitly left open the distinct question now raised by Lorenzo-Pérez, as to whether "the 30-year sentence could not be imposed because the jury had not been asked to decide whether those firearms were, in fact, automatic weapons."  <u>Melvin</u>, 27 F.3d at 715, n.9.  Thus, it cannot seriously be contended that it <u>necessarily</u> would have been futile for Lorenzo-Pérez to assert the same claim at trial.

Moreover, even if we were to assume, <u>arguendo</u>, that the failure to instruct the jury on the meaning of the term "machinegun" overcame the first two <u>Olano</u> criteria, the <u>Castillo</u> claim advanced by Lorenzo-Pérez nevertheless falters on the

32

fourth <u>Olano</u> criterion.  Absent a "miscarriage of justice,"

criminal convictions are not reversed automatically even though

the jury was never instructed on an essential element of the

offense.  See <u>Randazzo</u>, 80 F.3d at 631 (finding no "plain

error," even though intervening Supreme Court decision

determined that "materiality" is element of offense to be

determined by jury, normally an omission constituting

"structural error" necessitating reversal of conviction).

The government adduced uncontradicted evidence that

Lorenzo-Pérez threatened Acosta-Molina with the UZI.  Moreover,

neither Lorenzo-Pérez nor Lorenzo-Hernández explains why an UZI,

as a specie of firearm, does not readily meet the statutory

definition of "machinegun."   <u>Cf.</u> <u>infra</u> Section II.C (treating

distinct argument that <u>this</u> UZI was inoperable; hence did not

qualify as "machinegun").  For the foregoing reasons, Lorenzo-

Pérez cannot demonstrate plain error.

## C.   <u>Inoperable UZI as "Machinegun"</u>

Lorenzo-Pérez claims that the UZI did not qualify as

a "machinegun" under section 924(c), as a matter of law, since

a weapons expert testified that it had been damaged and/or

clogged at some time in the past, and could not be fired until repaired. We disagree.[11]

While appellant cites no authority for the present proposition, numerous decisions hold otherwise. See, e.g., United States v. Adams, 137 F.3d 1298, 1299-1300 (11th Cir. 1998); United States v. Hunter, 101 F.3d 82, 85 (9th Cir. 1996); United States v. Maddix, 96 F.3d 311, 316 (8th Cir. 1996); United States v. Yannott, 42 F.3d 999, 1006 (6th Cir. 1994); United States v. Willis, 992 F.2d 489, 491 n.2 (4th Cir. 1993); United States v. Ruiz, 986 F.2d 905, 910 (5th Cir. 1993); United States v. Buggs, 904 F.2d 1070, 1075 (7th Cir. 1990). Nor have we found a reported decision to the contrary.

Although we have yet to decide the issue, but cf. United States v. Veilleux, 40 F.3d 9, 11 n.1 (1st Cir. 1994) (questioning, in dictum, ill-advised government concession that § 923(a) required proof that weapon was operable), we find the rationale adopted by our sister circuits plainly persuasive. Subsection 923(a)(23) broadly defines "machinegun" as "any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger." 18

---

[11]As it poses an issue of statutory interpretation, the present claim is reviewed de novo. See United States v. Rostoff, 164 F.3d 63, 66 (1st Cir. 1999).

34

U.S.C. § 921(a)(23) (cross-referencing 26 U.S.C. § 5845(b)) (emphasis added). As the UZI in question plainly met the requirements of subsection 921(a)(23), we affirm Lorenzo-Pérez's conviction and sentence under Count 5.[12]

## D.    Consecutive Sentences

Lorenzo-Pérez next contends that the district court committed reversible error in directing that the thirty-year prison term imposed under Count 5 run consecutively to the five-year term imposed under Count 3, see supra note 2, since both counts alleged subsection 924(c) violations arising from a single predicate offense, i.e., the Mieses-Pimentel hostage-taking. As appellant failed to object at sentencing, we review for plain error. See United States v. Torres-Rosa, 209 F.3d 4, 8 (1st Cir. 2000).

---

[12]In a May 2, 2000, motion submitted prior to oral argument, Lorenzo-Pérez purported to notify the panel of other case authorities for a distinct proposition: that the government had adduced no evidence from which a jury might infer the requisite mens rea, i.e., that he knew the UZI he possessed came within the definition set forth in § 921(a)(23). See Staples v. United States, 511 U.S. 600, 604 (1994). Even if Staples were legally and factually apposite, which it is not, see United States v. Shea, 150 F.3d 44, 51-52 (1st Cir.) (detailing reasons Staples rationale is inapplicable to § 924(c) offenses), cert. denied, 525 U.S. 1030 (1998), appellant failed to raise this distinct "mens rea" argument in his appellate brief. Therefore, it has been waived. See United States v. Li, 206 F.3d 56, 57 n.1 (1st Cir. 2000).

The government acknowledges that there is no authority for imposing a consecutive thirty-year term. Moreover, though we have never addressed the issue, every circuit which has ruled to date agrees with the position urged by Lorenzo-Pérez. See, e.g., United States v. Correa-Ventura, 6 F.3d 1070, 1085 (5th Cir. 1993); United States v. Martinez, 7 F.3d 146, 147-48 (9th Cir. 1993); United States v. Sims, 975 F.2d 1225, 1235-36 (6th Cir. 1992); United States v. Freisinger, 937 F.2d 383, 391-92 (8th Cir. 1991); United States v. Luskin, 926 F.2d 372, 376-77 (4th Cir. 1991); United States v. Henning, 906 F.2d 1392, 1399 (10th Cir. 1990).

Congress enacted subsection 924(c) principally as a sentencing-enhancement mechanism for application to persons convicted of underlying crimes of violence committed through the use of firearms. Nevertheless, the imposition of consecutive sentences under subsection 924(c) for using multiple weapons during a single crime of violence would impinge upon fundamental "double jeopardy" principles. See id.

Accordingly, we hold that the consecutive sentences imposed upon Lorenzo-Pérez for the two firearms convictions, involving but one hostage-taking, are to run concurrently.

E.   **The Severance Motions**

Finally, all four appellants claim that it was error to deny their motions for severance, which were based on their contention that trial counsel for their co-defendant, Raimary Lavandier, unexpectedly interposed a totally antagonistic defense in mid-trial, thus essentially assuming the role of a "second prosecutor." Appellants identify two specific claims of prejudice: (1) that in opening and closing arguments, as well as in cross-examining Acosta-Molina, Lavandier's counsel focused upon and vouched for Acosta-Molina's testimony that Peña-Morfe, Lorenzo-Pérez, and Peña-Lora were the hostage-takers who assaulted him violently, brandished various firearms, and repeatedly threatened his life and that of Mieses-Pimentel; and (2) that Lavandier's trial counsel ultimately utilized Acosta-Molina's testimony in forging a defense of duress, i.e., that the violent behavior of these appellants intimidated her into committing the offenses charged.

Appellants argue that such an antagonistic defense constituted a per se ground for severance, since it was inevitable that the jury would convict them were it to credit the prejudicial allegations Lavandier made against her intimidators. See, e.g., United States v. Buljubasic, 808 F.2d 1260, 1264 (7th Cir. 1987) (noting that codefendant's coercion defense made severance "unavoidable").

37

We review severance rulings for any manifest abuse of discretion which deprived appellant of a fair trial and resulted in a miscarriage of justice. See United States v. Magana, 127 F.3d 1, 7 (1st Cir. 1997). As we have explained, however:

> "[P]ersons who are indicted together should be tried together[,] since [t]his practice helps both to prevent inconsistent verdicts and to conserve resources (judicial and prosecutorial). Thus, when multiple defendants are named in a single indictment, a defendant who seeks a separate trial can ordinarily succeed in obtaining one only by making a strong showing of evident prejudice. The hurdle is intentionally high . . . ."

United States v. Flores-Rivera, 56 F.3d 319, 325 (1st Cir. 1995) (emphasis added; citation omitted). Moreover, severance is especially disfavored in conspiracy cases. See United States v. DiMarzo, 80 F.3d 656, 659 (1st Cir. 1996).

In order to gain a severance based on antagonistic defenses, "'the antagonism . . . must be such that if the jury believes one defense, it is compelled to convict the other defendant'." United States v. Woods, 210 F.3d 70, 79 (1st Cir. 2000) (emphasis added; citation omitted). Thus, for example, mere fingerpointing among codefendants — i.e., the familiar "he did it, not I" defense — normally is not a sufficient ground for severance. See, e.g., Zafiro v. United States, 506 U.S. 534, 538-39 (1993) (declining to adopt "bright line rule" that

conflicting defenses inevitably require severance); <u>United</u> <u>States </u>v. <u>McLaughlin</u>, 957 F.2d 12, 18 (1st Cir. 1992) ("The fact that two defendants assert antagonistic defenses does not, <u>per</u> <u>se</u>, require severance, even if defendants are hostile or attempt to cast blame on each other.").

The present record discloses nothing remotely approaching a manifest abuse of discretion by the district court. First, in her opening statement Raimary Lavandier's counsel expressly flagged, for all to hear, the substance of her anticipated defense,[13] yet appellants' counsel interposed no objection, let alone a motion to sever. <u>See</u> <u>Woods</u>, 210 F.3d at 78-79 (noting that defendant waives right to belated severance if previously placed on notice of nature of codefendant's anticipated entrapment defense); <u>see</u> <u>also</u> <u>United States</u> v. <u>Gio</u>, 7 F.3d 1279, 1284-85 (7th Cir. 1993); Fed. R. Crim. P. 12(b)(5) (requiring that severance motions be presented prior to trial). When appellants finally moved for severance, government counsel

---

[13]Lavandier's counsel argued, in pertinent part: "<u>If</u> <u>you</u> <u>believe</u> <u>the</u> <u>witnesses</u> <u>from</u> <u>the</u> <u>government</u> then you will hear some chilling evidence . . . . You are going to hear testimony about how scared the victim was, you are going to hear how scared and intimidated his family was, and you are even going to hear about how scared and intimidated other participants in this kidnaping were. You are going to hear how <u>the</u> <u>perpetrators</u> <u>of</u> <u>this</u> <u>crime</u> used guns, used other kinds of force, and used all kinds of means to instill fear, not only in the victim but also among the other people . . . ." (Emphasis added.)

39

noted that even the government had been "aware of the [Lavandier] defense . . . since before the trial," and expressed "astonish[ment] to find out [the codefendants] didn't know what [her] defense was going to be."  Nor have appellants shown cause for their belated objections, which were not forthcoming until the Acosta-Molina cross-examination.  See Fed. R. Crim. P. 12(f) (requiring defendant to show cause for failing to move for severance before trial); United States v. Munoz, 894 F.2d 292, 294 (8th Cir. 1990).

Second, even if the severance claim were preserved, the record refutes the principal complaint advanced by appellants: that Lavandier's counsel somehow elicited additional inculpatory evidence during the cross-examination of Acosta-Molina by exceeding the scope of direct examination.  For example, appellants argue that Lavandier's counsel "extract[ed] [Acosta-Molina's] opinions and conclusions" concerning the purport of the nickname given the UZI — "The Silencer" — whereas on direct examination the prosecutor had merely elicited the nickname given the gun, "not what it was for."  But in fact Acosta-Molina had already testified that Lorenzo-Pérez threatened him with the UZI, called it "The Silencer," and informed Acosta-Molina that it was "for the people who talk."  The purport could not have been made much clearer.

Thus, the cross-examination by Lavandier's counsel, as the district court observed, was "basically a reaffirmation of the [government] witness's testimony [on direct]," neither adding to, nor subtracting from, the government's case. See United States v. Arias-Villanueva, 998 F.2d 1491, 1506-07 (9th Cir. 1993) (finding no abuse of discretion in denial of severance motion where evidence supporting defendant's duress defense would have been admissible against her codefendant at separate trial); see also United States v. Rose, 104 F.3d 1408, 1416 (1st Cir. 1997) ("[T]he level of antagonism in defenses is measured by the evidence actually introduced at trial; argument by counsel is not evidence.").[14]

Finally, the Lavandier defense was not irreconcilable with appellants' defenses. As the incompatibility of defenses is measured in degree, appellants must establish that any incompatibility was very substantial. "To obtain severance on the grounds of conflicting defenses, a defendant has to demonstrate that the defenses are so irreconcilable as to involve fundamental disagreement over core and basic facts." United States v. Paradis, 802 F.2d 553, 561 (1st Cir. 1986)

---

[14]We do not read the Rose case as holding that severance might never be warranted where defense counsel developed, through argumentation, a truly prejudicial antagonistic defense from the government's evidence alone. Each case must be assessed on its own facts.

(emphasis added); <u>United States</u> v. <u>Luciano Pacheco</u>, 794 F.2d 7, 9 (1st Cir. 1986) ("[S]ince the need to believe one defendant over another will always occur in the face of antagonistic or fingerpointing defenses, this requisite credibility determination cannot be, and is not, the decisive factor. Rather, <u>the</u> <u>need</u> <u>for</u> <u>severance</u> <u>turns</u> <u>on</u> <u>the</u> <u>degree</u> <u>of</u> <u>conflict</u>, and the extent to which the antagonism goes beyond mere fingerpointing into the realm of fundamental disagreement over core and basic facts.") (emphasis added).

Foremost, appellants incorrectly intimate that a codefendant's defense of duress necessitates a severance in every instance. <u>See</u>, <u>e.g.</u>, <u>United States</u> v. <u>Musquit</u>, 191 F.3d 928, 941 (8th Cir. 1999) (finding that defendant had not shown that "legally cognizable prejudice" resulted from his interposition of duress defense); <u>Arias-Villanueva</u>, 998 F.2d at 1507; <u>United States</u> v. <u>Villegas</u>, 899 F.2d 1324, 1346 (2d Cir. 1990) ("Nor is it sufficient [for severance] that one defendant contends that another coerced him to engage in the unlawful conduct if the jury could believe both that contention and the codefendant's defense [of nonparticipation].") (citation omitted); <u>United States</u> v. <u>Almeida-Biffi</u>, 825 F.2d 830, 833 (5th Cir. 1987) (finding that "jury's acceptance of [defendant's]

42

duress defense did not require the jury to disbelieve her husband's defense [of nonparticipation]").

In the cases cited by appellants, the defendants had intended to testify that they knowingly participated in the offenses, but not until after their codefendants had coerced or intimidated them.[15] Were the jury to credit such a defense, it would be logically compelled to find that the codefendants themselves committed the crime which they coerced the defendant into joining.

By contrast, while cross-examining Acosta-Molina and during closing argument, defense counsel never conceded that Lavandier had participated in the hostage-taking, let alone that she had been coerced to do so by any appellant. Instead, she

---

[15]See United States v. Serpoosh, 919 F.2d 835, 838 (2d Cir. 1990) (reversing denial of severance motion where two defendants provided diametrically opposed versions of core events underlying drug transaction, each arguing in turn that the other had coerced or tricked him into participating); United States v. Peveto, 881 F.2d 844, 858 (10th Cir. 1989) (reversing denial of severance where defenses were "mutually exclusive," in that jury could not have believed each defendant's assertion that he was "held against his will" at the scene of the crime if it had believed the codefendant's defense that he was becoming a government informant who "set up" drug dealers, and that he knew for a fact that the defendant had purchased drugs); Buljubasic, 808 F.2d at 1264 (noting that defendant first planned to testify that he unwittingly participated in offense by delivering money to codefendant, but decided to put on defense that he knew he was participating in a crime, but was intimidated into participation because of codefendant's reputation for carrying guns).

focused her argument on a single defense; namely, that Lavandier was "merely present" at the third residence ("[N]or did she participate in any significant way in this offense, other than being present and doing what she normally did . . . in that house.")

In recounting the government's evidence that the hostage-takers had intimidated Acosta-Molina, defense counsel did not suggest that the jury necessarily should believe Acosta-Molina's identification of appellants as the hostage-takers. Rather, in the main she suggested that Acosta-Molina's description of the hostage-takers' violent behavior (whatever their identity) was totally at odds with Lavandier's passivity and benign presence at the scene of the crime ("[S]he didn't participate with these kinds of [violent] people."). Defense counsel likewise emphasized that Acosta-Molina had to muster all his courage in order to request that his cohorts remove Mieses-Pimentel from his house, and suggested that it was implausible that a small female in Lavandier's position could have withstood such violent hostage-takers when they relocated the victim to her residence. Finally, defense counsel noted that Lavandier, unlike the other hostage-takers, neither attended nor instructed Mieses-Pimentel. ("[She] never came into his room,

44

[she] never held a gun to his head, [she] never engaged in any kind of intimidation that he was receiving from his captors.")

On the other hand, the primary defense advanced by appellants was that they never participated in the crime charged; i.e., that Acosta-Molina falsely identified and implicated them in the hostage-taking. Thus, the "mere presence" defense advanced by Raimary Lavandier did not depend upon undermining the defenses presented by appellants. Lavandier neither testified, nor pointed to any evidence, for example, that Peña-Morfe, Lorenzo-Pérez or Peña-Lora threatened her. Cf. supra note 15. Instead, she argued that regardless whether Acosta-Molina and the other government witnesses were telling the truth,[16] the jury should not convict her, since her conduct was inconsistent with the profile of these defendants. Accordingly, denial of the belated motions for severance did not constitute a manifest abuse of discretion.

---

[16]Appellants argue that Lavandier's counsel vouched for the government's evidence in her closing statement: "I submit to you that you ought to have total respect for what [Mieses-Pimentel] testified to." Appellants have wrenched the quoted statement from its context. Lavandier's counsel had just finished discussing Mieses-Pimentel's testimony concerning whether Lavandier had ordered him to be quiet, thus suggesting that Lavandier was one of the hostage-takers, or had simply asked him to be quiet. Counsel in no sense suggested that the jury credit any other part of Mieses-Pimentel's testimony as it pertained to Lavandier's codefendants.

45

The conviction and sentence of appellant Lorenzo-Hernández under Count 5 is hereby vacated, and the case is remanded for resentencing on the remaining counts. The imposition of consecutive terms of imprisonment upon appellant Lorenzo-Pérez under Counts 3 and 5 is hereby vacated, and the prison terms on these counts shall run concurrently. In all other respects, the district court judgment is affirmed.

SO ORDERED.