**Edward R. HUGHES,**

v.

**UNITED STATES of America.**

No. 01–451–T.

United States District Court,
D. Rhode Island.

Jan. 23, 2003.

Edward R. Hughes, New York City, pro se.

Kenneth P. Madden, U.S. Attorney's Office, Providence, RI, for defendant.

### *MEMORANDUM AND ORDER*

TORRES, Chief Judge.

Edward R. Hughes has filed a motion to vacate, set aside, or correct sentence pursuant to 28 U.S.C. § 2255. For reasons stated below, that motion is denied.

#### *Background*

Hughes was convicted of attempted extortion in violation of 18 U.S.C. §§ 1951 (the Hobbs Act) and 2. Hughes' conviction stemmed from his attempt to obtain money from his employer, Automation Software, Inc. ("ASI"), by falsely reporting that ASI's president, Brian McCarthy, had been kidnapped in Mexico and that the kidnappers were demanding a ransom of one million pesos (approximately $325,000.00) when, in fact, McCarthy had been murdered.

The evidence presented at trial showed that Hughes was an ASI employee who had a strained relationship with McCarthy. On February 6, 1994, McCarthy traveled to Mexico to meet with Hughes and intended to inform Hughes that Hughes' employment was being terminated. Hughes asked McCarthy to delay his arrival until late that evening because

Hughes was busy. Hughes met McCarthy at the Mexico City airport and insisted on driving several hours that night to their destination via roads that were considered dangerous to travel after dark. The following day, McCarthy was found shot to death and partially buried next to a side road near the Town of Queretaro. McCarthy's clothes and personal effects were found buried nearby.

Before McCarthy's body was found, Hughes had returned to the United States and inexplicably spent the night in New York without communicating with anyone. The next day, Hughes reported to ASI that he and McCarthy had been kidnapped, that a ransom demand of one million pesos had been made for McCarthy's return and that the money should be given to him for delivery to the kidnappers.

The murder weapon never was found but 9 mm bullet fragments were recovered from McCarthy's body, and Richard Krum, the government's ballistics expert testified that the fragments and 9 mm casings found at the murder scene could have come from a Sig Sauer 9 mm pistol. On cross examination, Krum conceded that they also could have been fired by several other types of handguns.

The government presented additional evidence that Hughes had purchased a Sig Sauer 9 mm pistol about six months earlier and that, shortly before McCarthy's murder, Michael Larivee, a friend of Hughes' son, had done some target shooting at Hughes' home with a gun belonging to the Hughes family that looked similar to a Sig Sauer. Krum opined that casings recovered behind Hughes' home were fired by the same gun as the casings recovered at the murder scene.

A jury found Hughes guilty and the Court sentenced him to twenty years imprisonment and three years supervised release. Hughes, also, was ordered to make restitution to the Hartford Insurance Company for the $123,100 in life insurance proceeds that Hartford paid to McCarthy's widow. Hughes' conviction and sentence were affirmed on appeal. *United States v. Hughes,* 211 F.3d 676 (1st Cir.2000).

In support of his § 2255 motion, Hughes claims that this Court lacked jurisdiction because the indictment was defective. Hughes further claims that he was deprived of his right to effective assistance of counsel because his attorney had a conflict of interest which adversely impacted his performance and that his attorney's performance was, otherwise, substandard.

### Discussion

The pertinent portion of § 2255 provides:

> A prisoner in custody under sentence of a court established by Act of Congress claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack, may move the court which imposed the sentence to vacate, set aside or correct the sentence.

28 U.S.C. § 2255.

▇▇▇ A prisoner seeking relief under § 2255 is procedurally barred from raising issues not presented on direct appeal unless he demonstrates " 'cause' and 'prejudice;' " or, alternatively, that he is " 'actually innocent.' " *Brache v. United States,* 165 F.3d 99, 102 (1st Cir.1999) (*quoting Murray v. Carrier,* 477 U.S. 478, 485, 496, 106 S.Ct. 2639, 91 L.Ed.2d 397 (1986)). However, ordinarily, those showings are not required with respect to ineffective assistance of counsel claims. *Knight v.*

*United States*, 37 F.3d 769, 774 (1st Cir. 1994).

### I. *Sufficiency of the Indictment*

■ Hughes argues that the indictment was defective because it failed to allege criminal intent, an element of the offense charged. However, Hughes did not challenge the sufficiency of the indictment on appeal and he has not demonstrated "cause" for his failure to do so. Accordingly, he is barred from raising that issue, now.

■ In any event, Hughes' argument lacks merit. Although the indictment did not expressly allege that Hughes acted with criminal intent, that allegation was clearly conveyed. Thus, the indictment charged that:

> On or about February 8, 1994, in the District of Rhode Island, the defendant, EDWARD R. HUGHES, did attempt to obstruct, delay and affect commerce as that term is defined in Title 18, United States Code, Section 1951, in that the defendant, EDWARD R. HUGHES, did attempt to obtain the property of Automation Software, Inc., with its consent having been induced by the wrongful use of actual and threatened force, violence and fear, in that the defendant told officials of Automation Software, Inc. that unless he was provided ransom of $1 million pesos which he alleged he would deliver to kidnappers in Mexico, Brian McCarthy would be killed.
>
> All in violation of Title 18, United States Code, Sections 1951 and 2.

That language was sufficient to provide Hughes with full and fair notice of the charge against him, including the accusation that he had acted with criminal intent. *See United States v. Gray*, 260 F.3d 1267, 1282–83 (11th Cir.2001) (although Hobbs Act indictment did not expressly allege mens rea, indictment gave defendant adequate notice of the charges against him; and, thus, defendant was not entitled to relief when indictment's sufficiency was raised for first time on appeal), *cert. denied* — U.S. ——, 122 S.Ct. 2672, 153 L.Ed.2d 845 (2002).

■ Moreover, even if it is assumed, *arguendo*, that the indictment was deficient, the alleged deficiency would not have deprived this Court of subject-matter jurisdiction. Absent a showing that a defendant's substantial rights were prejudiced, an indictment's omission of an element of a charged offense does not divest the district court of jurisdiction.[1] *United States v. Bjorkman*, 270 F.3d 482, 490 (7th Cir.2001), *cert. denied* — U.S. ——, 122 S.Ct. 2290, 152 L.Ed.2d 1049 (2002), —— U.S. ——, 122 S.Ct. 2290, 152 L.Ed.2d 1049 (2002).

Here, Hughes has failed to show that his substantial rights were prejudiced. Indeed, it is difficult to see how such a showing could be made in light of the fact that the jury was specifically instructed that the government was required to prove that Hughes acted "knowingly and willfully." Tr. at 100, *United States v. Hughes* (Cr. No. 96–0063T) (Sept. 23, 1998).[2] Fur-

---

**1.** Hughes' assertion that the plain error standard does not apply is incorrect. *See United States v. Mojica–Baez*, 229 F.3d 292, 311 (1st Cir.2000) (applying plain error standard where indictment's alleged omission of element of crime charged was raised for first time on appeal and indictment otherwise provided defendants with fair notice of the charge against them); *United States v. Corpo-*

*ran–Cuevas*, 244 F.3d 199, 202 (1st Cir.2001) (declining to reverse conviction under "hostage-taking statute," 18 U.S.C. § 1203, where any error resulting from indictment's alleged omission of an element of the offense was harmless).

**2.** The Court explained those terms as follows:

thermore, the evidence that Hughes had acted with the requisite intent was overwhelming. *See Hughes,* 211 F.3d at 683 n. 4.

## II. *Defense Counsel's Alleged Conflict of Interest*

Hughes argues that his counsel, Joseph Palumbo, had a conflict of interest that adversely affected his performance. More specifically, Hughes asserts that the possibility that Palumbo might be called as a witness; and, therefore, would have been required to withdraw and refund the fee already paid to him, caused Palumbo to forego pursuing a defense that the police had fabricated and concealed evidence because it deterred him from cross examining Nicholas Murphy, an FBI agent, about Murphy's failure, during an interview, to ask what firearms Hughes owned.

A criminal defendant has a Sixth Amendment right to be represented by counsel who has no interests that conflict with counsel's duty of individual loyalty to the client. If a defendant who does not waive that right is convicted, the conviction may be vacated if the defendant can show what, in legal parlance, is referred to as an "actual conflict" that adversely affected the adequacy of counsel's representation. *Cuyler v. Sullivan,* 446 U.S. 335, 348–50, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980); *Reyes–Vejerano v. United States,* 276 F.3d 94, 97–98 (1st Cir.2002); *Familia–Consoro v. United States,* 160 F.3d 761, 764 (1st Cir.1998); *Saccoccia v. United States,* 69 F.Supp.2d 297, 302 (D.R.I.1999).

Establishing an actual conflict requires a dual showing that the lawyer failed to pursue a plausible defense strategy or tactic and that the strategy or tactic would have conflicted with or was not pursued because of the lawyer's other loyalties or interests. *Familia–Consoro,* 160 F.3d at 764. In effect, such a showing gives rise to a presumption that the defendant was denied adequate representation because, unlike usual ineffective assistance claims, the defendant need not prove that he was prejudiced. *Carey v. United States,* 50 F.3d 1097, 1100 (1st Cir.1995) ("Prejudice is legally presumed if the defendant demonstrates that counsel actively represented conflicting interests and that an actual conflict of interest adversely affected his [or her] lawyer's performance.").

The alleged conflict must consist of something more than an " 'attenuated hypothesis having little consequence to the adequacy of representation.' " *Id.* (*quoting Brien v. United States,* 695 F.2d 10, 15 (1st Cir.1982)). Moreover, in order to demonstrate that the strategy or tactic not pursued was "plausible," the defendant must show that there was a reasonable basis for pursuing it but he need not prove that it would have resulted in an acquittal. *Saccoccia,* 69 F.Supp.2d at 302–3. Here, Hughes has failed to establish either that Palumbo's alleged interest in not becoming a witness is anything more than an "attenuated hypothesis" or that cross examining Murphy about Murphy's failure to inquire about Hughes' firearms was a plausible tactic.

An act is done knowingly if it's engaged in voluntarily, intentionally and with an awareness of the nature of the act, as opposed to by accident, mistake or for some other innocent reason. * * * An act is done willfully if it's done knowingly and with a specific intent to do something that the law forbids. It requires proof that the Defendant was guilty of something more than mere negligence or mistake. It requires proof that the Defendant acted with the purpose of doing something that the law prohibits.
Tr. at 103–4.

Hughes' assertion that Palumbo had a pecuniary interest in not being called as a witness rests on the unsupported assumption that it would have been more profitable for Palumbo to continue representing Hughes than to devote his energies to representing other clients. More importantly, Hughes fails to provide a sufficient basis for inferring that Palumbo had any reason to believe that he might be called as a witness. Hughes relies on a letter sent by the prosecutor to Palumbo two months before trial. That letter stated:

I am forwarding this letter to clarify my concern that you are both a potential witness at trial and defendant's counsel. *I assure you that we have no intention of calling you as a witness.* Nor does the government intend to object to your continued representation of the accused. You were present during the interview of Mr. Hughes on February 22, 1994. The substance of much of what Hughes said will be offered into evidence by the government through Special Agent Nicholas J. Murphy. As reflected in the summary of the interview conducted on February 22, 1994, when Murphy began to bring certain inconsistencies and contradictions to Hughes' attention and ask for explanation, you terminated the interview. This explains why the interview is incomplete in content, e.g., why Hughes was not asked about guns which he possessed or owned.

Letter from Edwin Gale to Joseph Palumbo of July 7, 1998 (emphasis added).

Hughes argues that, because of that letter, Palumbo refrained from cross-examining Agent Murphy at trial about why Murphy did not ask Hughes, during the February 22 interview, what firearms Hughes owned or possessed. That argument ignores the unequivocal statement in the letter that the government had no intention of calling Palumbo as a witness.

Indeed, if the subject had been broached and Murphy testified that he didn't ask Hughes about his firearms because the interview was prematurely terminated by Palumbo, there would have been no need for the government to call Palumbo as a witness.

Nor would it have been a plausible tactic for Palumbo to have cross examined Murphy about Murphy's failure to inquire about the firearms that Hughes owned. Hughes does not deny that Palumbo prematurely terminated the interview because of various inconsistencies and contradictions in Hughes' statements. Thus, cross examining Murphy on that point would have elicited an explanation harmful to Hughes' case and any testimony by Palumbo would have only confirmed that explanation.

In any event, Hughes fails to satisfactorily explain how even an unexplained failure by Murphy to ask those questions would have supported a "police fabrication" defense.

### III. *The Other Ineffective Assistance Claims*

Hughes recites a litany of other ways in which he claims that Palumbo's assistance was ineffective. They range from failure to seek dismissal of the indictment to failure to object to the calculation of Hughes' sentence and they include failure to call various witnesses, failure to challenge certain evidence, and failure to object to the prosecutor's closing argument.

### A. *The Ineffective Assistance Standard*

A defendant who claims that he was deprived of his Sixth Amendment right to effective assistance of counsel must demonstrate:

(1) That his counsel's performance "fell below an objective standard of reasonableness" and

(2) "[A] reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."

*Strickland v. Washington,* 466 U.S. 668, 687–88, 694, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

The defendant bears the burden of identifying the specific acts or omissions constituting the allegedly deficient performance. Conclusory allegations or factual assertions that are fanciful, unsupported or contradicted by the record will not suffice. *Dure v. United States,* 127 F.Supp.2d 276, 279 (D.R.I.2001) (*citing Lema v. United States,* 987 F.2d 48, 51–52 (1st Cir.1993)); *see also Barrett v. United States,* 965 F.2d 1184, 1186 (1st Cir.1992) (summary dismissal of § 2255 motion is proper where, *inter alia,* grounds for relief are based on bald assertions).

In assessing the adequacy of counsel's performance:

[T]he Court looks to "prevailing professional norms." A flawless performance is not required. All that is required is a level of performance that falls within generally accepted boundaries of competence and provides reasonable assistance under the circumstances.

*Ramirez v. United States,* 17 F.Supp.2d 63, 66 (D.R.I.1998) (*quoting Scarpa v. DuBois,* 38 F.3d 1, 8 (1st Cir.1994) *and* (*citing Strickland,* 466 U.S. at 688, 104 S.Ct. 2052)).

The standard applied in making that assessment is a highly deferential one. Thus,

[The] court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defen-

dant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'

*Strickland,* 466 U.S. at 689, 104 S.Ct. 2052 (*quoting Michel v. Louisiana,* 350 U.S. 91, 101, 76 S.Ct. 158, 100 L.Ed. 83 (1955)).

Counsel's judgment need not be right so long as it is reasonable. *United States v. McGill,* 11 F.3d 223, 227 (1st Cir.1993). Furthermore, reasonableness must be determined "[without] the distorting effects of hindsight." *Strickland,* 466 U.S. at 689, 104 S.Ct. 2052.

### B. *The Alleged Ineffective Assistance*

Since the Court already has determined that there was no basis for dismissing the indictment on the ground that it was defective, Palumbo cannot be faulted for failing to make such a motion. Counsel is not required and, in some cases is not ethically permitted, to pursue claims that patently lack merit. *Ouimette v. United States,* C.A. No. 99–489–T, slip op. at 6 (D.R.I. June 21, 2001); *see also United States v. Cronic,* 466 U.S. 648, 657 n. 19, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984) (right to effective assistance of counsel does not require the "useless charade" of presenting a meritless defense). Therefore, the Court will only discuss Hughes' other ineffective assistance claims.

#### 1. *Failure to Call Witnesses*

Hughes claims that his counsel was delinquent in not calling Hughes' wife, Gloria, and/or his son, Arthur, as witnesses to rebut the evidence that Hughes' Sig Sauer 9 mm was the murder weapon. He has tendered an affidavit from Gloria in which she states that she did not observe a firearm in Hughes' possession when he departed for Mexico and that she saw the Sig Sauer at their Rhode Island home after Hughes left. Hughes also has ten-

dered an affidavit in which Arthur states that the Sig Sauer was in his possession when the murder occurred and that it was only one of the pistols fired in the area behind Hughes' home property where investigators found the spent 9 mm casings matching those recovered at the murder scene. Finally, Hughes' own affidavit states that, in preparing for trial, he informed Palumbo that Arthur would testify that the Sig Sauer was in his possession during the weeks preceding and following McCarthy's murder.

It should be noted that, although Gloria's affidavit states that she told Palumbo that she had not observed any firearm in her husband's possession when he left for Mexico, neither her affidavit nor Hughes' affidavit states that Palumbo was told about Gloria's claim that she, later, saw the Sig Sauer in Rhode Island. Since counsel is not required to be clairvoyant in order to be deemed effective, it is difficult to see how Palumbo could be faulted for not calling Gloria as a witness.

 Moreover, assuming that Hughes did tell Palumbo about Arthur's proffered testimony, the decision not to call Arthur as a witness cannot be characterized as unreasonable. "The decision whether to call a particular witness is almost always strategic, requiring a balancing of the benefits and risks of the anticipated testimony." *Lema*, 987 F.2d at 54. "[T]actical decisions, whether wise or unwise, successful or unsuccessful, cannot ordinarily form the basis of a claim of ineffective assistance." *United States v. Ortiz Oliveras*, 717 F.2d 1, 3 (1st Cir.1983) (*citing United States v. Bosch*, 584 F.2d 1113 (1st Cir. 1978)).

Here, it would have been reasonable for Palumbo to take into account that, since Arthur was Hughes' son, the jury was likely to view him as biased thereby diminishing the weight given to his testimony.

More importantly, Arthur's proffered testimony undoubtedly would have prompted inquiries by the prosecutor regarding what happened to the Sig Sauer. It would have been incumbent on Arthur to either produce the gun or account for its absence. If Arthur's testimony turned out to be false, producing the gun would have enabled the government, to match it to the shell casings found at the murder scene thereby conclusively proving Hughes' guilt. On the other hand, any proffered explanation as to why the gun was not preserved and could not be produced would have been extremely suspect given the gun's obvious importance as evidence in the case. Indeed, to this day, Hughes has neither produced the gun nor explained what happened to it.

Calling Arthur as a witness also would have presented additional risks to the defense. Among other things, it would have opened the door to questions about the strained relations between Hughes and McCarthy that could have buttressed the evidence of motive.

In short, Hughes has not demonstrated that defense counsel's failure to call either Gloria or Arthur as a witness was objectively unreasonable.

 Hughes also criticizes Palumbo's failure to call Carl Majeskey, a firearms identification expert retained to examine the various casings and bullet fragments obtained by the government. In his affidavit, Majeskey contends that the bullet fragments found in McCarthy's body could not be identified as having been fired by a Sig Sauer 9 mm because other types of weapons were capable of firing such projectiles. He also expresses suspicion that so few spent casings were found at Hughes' home and that all of them matched the spent casings found at the murder scene even though another gun

besides Hughes' Sig Sauer allegedly had been fired at that location.

Counsel's failure to call Majeskey to testify with respect to those matters was not unreasonable for two reasons. First, Majeskey's opinion that the bullets that killed McCarthy could have been fired by a weapons other than a Sig Sauer 9 mm would have added nothing to the concession that Palumbo elicited from Krum on cross examination. Second, it is highly unlikely that Majeskey would have been permitted to express his "suspicions" about the number of casings found at Hughes' home.

### 2. *Failure to Move to Suppress*

██ Hughes asserts that Palumbo was ineffective in not moving to suppress the cartridge casings that the FBI found at his home when it executed a search warrant. Hughes alleges that the search was tainted by a prior warrantless search but the only support that Hughes provides for that allegation is the following excerpt from Michael Larivee's grand jury testimony on April 14, 1996:

Q. In some time prior to today, did you go out to the premises with Nick Murphy to tell him about where it was that the shooting took place?

A. Yes.

Q. Did you try to describe to Nick Murphy accurately?

A. Yes.

Q. Where you shot it?

A. Yes.

Grand Jury Test. Tr. at 13, *In re Edward Hughes* (January 14, 1996).

There are several reasons why that statement did not present sufficient grounds for excluding the casings from

evidence. First, Larivee did not say that he and Murphy actually entered upon the premises. He simply stated that he went to the premises with Murphy and described where the target practice had taken place. Second, even if entry had been made, Larivee's testimony does not indicate that the entry occurred prior to issuance of the search warrant. In fact, it appears that the search warrant was issued and executed at least four days before Larivee's grand jury testimony. Third, even if Murphy and Larivee entered upon the property before the warrant was issued, that would not have been grounds for suppressing the evidence. Murphy's affidavit does not refer to any observations regarding the property; and, therefore, could not have been a factor in the magistrate judge's decision to issue the warrant. *See Murray v. United States,* 487 U.S. 533, 541–43, 108 S.Ct. 2529, 101 L.Ed.2d 472 (1988).

### 3. *The Government's Closing Argument*

██ Hughes argues that Palumbo was ineffective because he did not object to a number of statements made by the prosecutor during closing argument which Hughes asserts were unsupported by the evidence. The short answer to that argument is that counsel did challenge the propriety of those statements on appeal and the First Circuit found that all but one of them was amply supported by the evidence and the reasonable inferences that could be drawn from it. *Hughes,* 211 F.3d at 684–87. The one statement that the Court of Appeals found not to be grounded in the evidence was the statement that there were two toll booths on the road bypassing Queretaro.[3] However, the

---

**3.** In fact, as the government points out in its memorandum, at one point Agent Contreras

did testify that there were two or three toll booths but, at another point, he said that

Court of Appeals concluded that, in light of the "substantial circumstantial evidence supporting the jury's verdict," Hughes was not prejudiced by that statement. *Id.* at 687.

Hughes, now, contends that he was prejudiced because Palumbo's failure to object limited the Court of Appeals to reviewing under a "plain error" standard. That contention ignores the Court of Appeals' finding that the statements were amply supported by the evidence. Because the statements were supported by the evidence, it was not error, plain or otherwise, to allow them and it was not unreasonable for Palumbo to have refrained from objecting to them, thereby avoiding having been perceived by the jury as an obstructionist. *See Vieux v. Pepe,* 184 F.3d 59, 64 (1st Cir.1999) (counsel's failure to pursue a futile tactic did not render his performance deficient).

#### 4. *The Sentence*

 In sentencing Hughes, this Court determined, by a fair preponderance of the evidence, that Hughes acted with malice in killing McCarthy. Consequently, pursuant to § 2B3.2(c)(1) of the United States Sentencing Guidelines, Hughes' sentence was calculated under § 2A1.1 which prescribes the punishment for first-degree murder.[4]

Hughes argues that Palumbo was ineffective because he failed to object to use of the "preponderance of the evidence" standard rather than a "clear and convincing standard." That argument, too, lacks merit for several reasons.

First, the Guidelines call for application of the preponderance of the evidence standard in making sentencing determinations. U.S. Sentencing Guidelines Manual

§ 6A1.3, cmt. (2002). Moreover, utilization of that standard has been approved by both the Supreme Court and the First Circuit. *United States v. Watts,* 519 U.S. 148, 156–57, 117 S.Ct. 633, 136 L.Ed.2d 554 (1997); *United States v. Lombard,* 102 F.3d 1, 3–5 (1st Cir.1996). Palumbo cannot be faulted for failing to challenged such clear and binding authority.

In addition, Hughes has failed to demonstrate any likelihood that the result would have been different even if a "clear and convincing" standard had been utilized. The overwhelming evidence showed that McCarthy's murder was brutal and premeditated and this Court would have had no difficulty finding malice aforethought even under a "clear and convincing" standard.

#### 5. *Counsel's Performance on Appeal*

Finally, Hughes contends that Palumbo was deficient in failing to brief, on appeal, what Hughes asserts were 27 additional trial errors. The potpourri of alleged errors were identified only perfunctorily in an addendum to Hughes' appellate brief and the First Circuit determined that they had been waived. *Hughes,* 211 F.3d at 684 n. 6. Hughes has done nothing more than repeat the litany of alleged errors. He has failed to explain why they had merit or why counsel's failure to more vigorously pursue those claims amounted to ineffective assistance.

#### *Conclusion*

For all of the foregoing reasons and for the reasons stated in the government's memorandum in opposition, Hughes mo-

there was only one. Gov't's Resp. to Def.'s Mot. to Vacate, Set Aside, or Correct Sentence at 42 n. 8.

4. Because 18 U.S.C. § 1951 sets the maximum penalty for extortion at 20 years, that was the sentence imposed.

tion to vacate, set aside or correct sentence is denied.